## WELLS and others *v.* OREGON RY. & N. Co.

## SAME *v.* OREGON & C. RY. Co.

*(Circuit Court, D. Oregon. March 19, 1883.)*

1. EXCEPTIONS FOR IMPERTINENCE.

    Exceptions to a bill for impertinence will not be allowed, unless it is clear that the matter excepted to cannot be material to the plaintiffs' case; and matters which may be so material are not necessarily impertinent because they are such as the court may judicially take notice of; nor is it necessarily impertinent in a bill for an injunction to refer to recent adjudications of the question involved, in similar cases in other courts.

2. ACT OF INCORPORATION—CHANGE OF CORPORATE NAME.

    By an act of the legislature of Colorado of February 5, 1866, certain persons were incorporated as the "Holladay Overland Mail & Express Company," with the privilege and power of changing its name by an "order" of its directors "approved" by the stockholders; and the bill alleges that the stockholders, in pursuance of said act, duly changed the name of the corporation to "Wells, Fargo & Co.," which change was afterwards approved by the legislature by the act of January 26, 1872. *Held,* (1) that until the contrary appears, it should be presumed that the final action of the stockholders was had in pursuance of the order of the directors; (2) that the essential act in the proceeding was the vote of the stockholders, to which the order of the board was only preliminary, and therefore that portion of the act providing for such order ought to be considered merely directory; and (3) *semble,* that the act of 1872, approving the change, is not in conflict with section 1889 of the Revised Statutes, forbidding the legislature of Colorado from granting "private charters or especial privileges."

3. EXPRESS FACILITIES.

    This term is probably a sufficient description of the accommodation or service which a railway or other transportation company is expected and may be required to furnish a person or corporation engaged in the express business.

4. EXPRESS BUSINESS.

    This business has come to be a recognized branch of the carrying trade, of which the court will take notice; and a railway or other corporation created by the state to serve the public as a common carrier, is bound to furnish the usual and proper facilities to persons engaged in such business, who are so far the agents, bailees, and representatives of the public.

5. DECISIONS OF THE UNITED STATES CIRCUIT COURTS.

    The circuit courts of the United States are co-ordinate tribunals, constituting a single system, and the decisions of one of them, deliberately made, ought usually to be regarded as decisive of the question involved, until otherwise determined by the supreme court.

6. COMPENSATION OF A RAILWAY CORPORATION.

    Section 36 of the incorporation act, (Or. Laws, 532,) which declares a railway corporation formed thereunder to be a common carrier, and empowers it "to collect and receive such tolls or freights for transportation of persons or property thereon as it may prescribe," authorizes such corporation to take rea-

sonable toll, not inconsistent with its character and obligation as a common carrier, and no more; and, so far, it constitutes a contract between the corporation and the state, the obligation of which the latter cannot impair nor any court disregard.

7. REASONABLE COMPENSATION.

What is reasonable compensation under said section 36, when the parties cannot agree thereabout, is a question to be determined by the court; but in allowing a provisional injunction requiring a railway corporation to furnish an express company with the facilities theretofore enjoyed by it, over and upon its road, the court will assume that the compensation paid for such past facilities is reasonable, and require them to be furnished under the injunction at the same rate.

In Equity. Suits for injunction.

*Clarence A. Seward, M. W. Fechheimer,* and *J. R. Lewis,* for plaintiffs.

*Joseph N. Dolph* and *J. F. McNaught,* for defendants.

DEADY, J. These suits were commenced on December 11, 1882, and on the same day an order was made in each requiring the defendant therein to show cause why a provisional injunction should not issue, as prayed for in the bill; and also that in the mean time the defendants be so restrained. On January 25–6 the motions for provisional injunctions were heard at length—all the questions which can or may arise in the cases being argued by counsel with much zeal and ability. Contemporaneous with those, a similar suit was commenced by the plaintiff in Washington territory against the Northern Pacific Railway Company, and by an understanding between court and counsel a motion for an injunction was heard in that case at the same time with the Oregon cases—Mr. Chief Justice GREENE of that territory, in whose court the case is pending, being present at the hearing.

It appears from the bill in each case that the plaintiff is a corporation organized under the laws of Colorado, and engaged in the express business on the Pacific coast and elsewhere to the eastward of the Rocky mountains, including the country traversed by the lines of the defendants' railways, steam-boats, and steam-ships in Oregon, Washington, Idaho, California, and British Columbia; and has been such corporation and so engaged since February 5, 1866, when it succeeded to the express business carried on by Henry Wells, William G. Fargo, and four others, between New York and San Francisco, and elsewhere on the Pacific cost, since March, 1852.

The defendants, the Oregon Railway & Navigation Company and the Oregon & California Railway Company, are corporations formed under the laws of Oregon, with their principal places of business in

Portland, and engaged in the business of a common carrier of freight and passengers; and as such corporation the former owns and operates certain lines of railways, steam-boats, and steam-ships in Oregon, Washington, California, and British Columbia, and the latter owns and operates certain lines of railway in Oregon.

It is alleged in the bills that heretofore the plaintiff has been furnished by the defendants with all the necessary facilities for doing its express business over and upon their said lines of transportation, for which it has paid them a stipulated price, but that now the defendants refuse to furnish such facilities any longer, and have notified the plaintiff that hereafter they intend to do the express business on their lines of transportation themselves; and that such refusal would work an irremedial injury to the plaintiff.

The defendants filed exceptions to the bills for impertinence, which were heard and submitted at the same time with the motions for the injunctions. They are numerous, and include a large portion of the allegations contained in the bills, such as (1) matters which the court can judically know; (2) the extent, value, and importance of the express business in the United States, and the circumstances under which it has grown up and been transacted; (3) the usage and past conduct of railway companies in relation to the same; (4) the citation and quotation of acts of congress concerning or recognizing the express business; and (5) the averments concerning prior injunctions allowed by the courts in similar cases.

An allegation will not be expunged from a bill as impertinent unless its impertinence clearly appears; for if it is erroneously struck out the error is irremedial. Story, Eq. Pr. § 267.

Consistently with this rule I do not think these exceptions ought to be allowed. It may be material to a full and proper presentation of the plaintiff's case to allege the existence of facts within the judicial knowledge of the court, and, if so, they are pertinent thereto. The fact that they may be proved by reference to the judicial knowledge does not dispense with the averment of them, or render such averment impertinent. So, in regard to the allegations concerning the business in which the plaintiff is engaged and is seeking by this means to protect, the facts concerning its origin, growth, value, importance, and relation to the public and transportation companies, such as the defendants, may all be material to a proper understanding of the plaintiffs' case, and, if so, they may be stated with reasonable fullness in the bill. And this rule is more especially applicable to cases like these, which, although not exactly of first impression, involve the ap-

plication of established rules and principles to new and important instances arising out of comparatively recent but radical changes in the methods and circumstances attending the transit, receipt, transportation, and delivery of a very large amount of the valuable personal property in trust over the country.

Concerning the injunctions alleged to have been recently allowed in several of the United States circuit courts in similar cases, the matter is undoubtedly a proper one for the consideration of the court, as the adjudication of co-ordinate tribunals, and my impression is that it may as well be brought to the attention of the defendants and the knowledge of the court in this way, as similar adjudications, to which the plaintiff is a party, commonly are, in suits for infringement of patents. Curt. Eq. Prec. 30; Curt. Law of Pat. 544.

In answer to the applications for the injunctions the defendants filed the affidavits of their respective managers; but neither of these contradict or qualify the facts here stated, except in one particular. The affidavit of the manager of the Oregon & California Railway Company denies that the plaintiff has been notified that it would no longer be allowed express facilities on its lines of railway, but, on the contrary, avers that the plaintiff has a contract with said defendant for said facilities until November 1, 1883, as far south as Roseburg, but not over the extension being constructed to the southern boundary of the state, and then completed to Riddle's station, some 26 miles south of Roseburg. But it appears from the affidavit of the president of the plaintiff that he was informed by the president of the Northern Pacific Railway Company, and both the defendant corporations, in November, 1882, that the notice to the plaintiff from the Oregon Railway & Navigation Company, to the effect that it would not be allowed express facilities on its lines of transportation after December 31, 1882, except upon the steam-ships running between Portland and San Francisco, would lead to the same result in the case of the Oregon & California Railway Company, and that his board had determined to conduct the express business on the lines of the Northern Pacific Railway Company and those of the defendants for themselves.

Upon the facts, then, I think it may be concluded that the defendants intend and will, unless restrained therefrom, withdraw from the plaintiff on their lines of transportation all the express facilities heretofore afforded it, for the small portions of such lines which may not be included in that purpose at present would be of no benefit to the plaintiff if excluded from the remainder.

But, upon the case made by the bills, counsel for the defendants object to the allowance of the injunctions, because (1) it does not appear that the plaintiff is a corporation or has capacity to sue; (2) the statement as to the facilities heretofore afforded the plaintiff, and which will hereafter be required for the transaction of its business, is insufficient; (3) the defendants cannot be required, under their articles of incorporation and the laws of the state, to afford the plaintiff the facilities demanded, or to give it a preference over other shippers in the transportation of freight; (4) if the plaintiff is entitled to a continuance of the facilities heretofore afforded it over existing lines, it is not as to future extensions of such lines; and (5) the court has no power to determine the compensation to be paid by the plaintiff to the defendants for express facilities.

It is admitted that the plaintiff was, on February 5, 1866, duly incorporated, by an act of the legislature of Colorado of that date, as "The Holladay Overland Mail & Express Company," but it claimed that the subsequent attempt—November 12, 1866—to change its name to "Wells, Fargo & Company" failed of its purpose, and therefore there is no corporation of that name.

It appears that section 11 of the act incorporating the Holladay Overland Mail & Express Company contained a provision that "said company may change its name whenever the same shall be ordered by the vote of a majority of the board of directors thereof, at a meeting duly convened for that purpose: provided, such change is approved also by a majority of the stockholders in interest at a meeting duly convened for that purpose by a call from the president of the company."

The bills allege that "on November 12, 1866, and pursuant to the power conferred by section 11 of said act of incorporation, the stockholders of the said 'Holladay Overland Mail & Express Company' duly changed its said corporate name to the name of 'Wells, Fargo & Company;' and such change was duly approved by an act of the legislature of Colorado, passed January 26, 1872." The argument for the defendant upon this point is that a stockholders' meeting could not change the name of the corporation, because the act provided that the change should take place by the act of the directors, with the approval of the stockholders. In support of this construction of the act counsel cites *Wallamet Falls Co.* v. *Kittridge*, 5 Sawy. 48, in which case this court held that under section 19 of the Oregon corporation act, (Or. Laws, 528,) which provides that a meeting of the stockholders of

a corporation may "*authorize* the dissolution" thereof, that such vote did not dissolve the corporation, but only empowered the directors, by whom all the powers of the corporation were exercised unless otherwise specially provided, (Or. Laws, p. 526, § 9,) to take the necessary steps for its dissolution and winding up of its affairs. But the cases, so far from being parallel, are just the reverse. The Colorado act gave the preliminary action in the matter to the directors and the final effective action to the stockholders, while the Oregon act gives the initiative to the stockholders and the actual determination of the question to the directors. My impression is that upon the facts stated the the name of the corporation was duly changed.

And, *first*, it is alleged to have been done by the stockholders "pursuant to the power conferred" on them by the act authorizing the change,—that is, according to it; and to have been "duly" done by them,—that is, according to law. Upon these allegations, and until the contrary appears, I think it ought to be presumed that the action of the stockholders was taken after the preliminary order of the directors, rather than without it.

And, *second*, taking into consideration the whole provision on the subject of changing the name and the reason of it, the act ought to be construed as practically giving the power to make the change to the stockholders absolutely, with or without the preliminary order of the directors. The latter are not authorized to change the name, but to make an order that it may be done by the "company," and then comes the proviso and gives the final power over the subject to the "stockholders." The directors are the mere agents of the stockholders, and the clause giving them authority to order the change becomes a mere regulation of convenience concerning the method and order in which the thing is to be done, and not the essence of it. It is, therefore, merely directory. *Sprigg* v. *Stump*, 7 Sawy. 286, and cases there cited.

In *Rex* v. *Loxdale*, 1 Burr. 447, Lord MANSFIELD said: "There is a known distinction between the circumstances which are of the essence of a thing required to be done by an act of parliament and clauses merely directory."

It is not necessary, therefore, to consider what was the effect of the act of January 26, 1872, purporting to legalize the alleged change of name. For the defendants, it is contended that the act is invalid as being in conflict with section 1 of the act of March 2, 1867, (14 St. 426; section 1889, Rev. St.,) forbidding the legislature of a territory

"to grant private charters or special privileges," but permitting it to provide for the formation of corporations by "general corporation acts."

This argument assumes that a legislative act naming or changing the name of a corporation is so far an act authorizing the formation of a corporation,—a calling it into existence or conferring upon it a special privilege,—and *Newly* v. *Oregon Cent. Ry. Co.* 1 Deady, 616, is cited as showing that "the corporate name is a necessary element of the corporation's existence," without which "a corporation cannot exist." But this remark must be considered as made with reference to a corporation formed under the corporation act of Oregon, section 4 of which (Or. Laws, 525) expressly provides that the articles of incorporation "shall specify the name assumed by the corporation and by which it shall be known." And yet the law might provide that A., B., and C. should constitute or be formed into a corporation for any lawful purpose without any special name or designation. From the necessity of the case it would have to be described, rather than named, as A., B., and C., a corporation duly created or formed at a certain date for a certain purpose, and in time it might acquire the name of "the A., B. & C." railway or steam-boat company, as the case might be.

I doubt, then, if section 1889 of the Revised Statutes does prohibit a territorial legislature from naming or changing the name of an existing corporation, because such act is not a "charter" creating a corporation, or one conferring a "special privilege," within the meaning of the section. To name a corporation is not to create it any more than a person. Nor does it confer on it a special privilege. The privilege of having a name is not thereby monopolized or exhausted, but may be enjoyed by every corporation that has wit enough to devise one, upon the same terms. See *Southern Pac. Ry. Co.* v. *Orton*, 6 Sawy. 185.

But the attempt to legalize the change of name may be said to be an admission of its invalidity. Yet it must be considered that the matter of the change is lumped in the legalizing act with changes in the capital stock, and other "acts and proceedings of the corporation;" and therefore the validation of the change of name may have had very little to do with the passage of the act. And this suggestion gets force from the recital in the preamble to the act, to the effect that the name had been changed to Wells, Fargo & Company by "the board of directors and stockholders."

As to the insufficiency of the statement of the facilities allowed the plaintiffs on the defendant's lines, and which will hereafter be

required thereon for the transaction of its business, my impression is that the bills are probably explicit enough, though I think they might well have been made more so. But "express facilities" is a term which, from the nature of things, must by this time be pretty well understood between the parties most interested—the express company and the railway company.

As interpreted by the customs and usages of these parties, and sanctioned and adopted by the decisions of the courts, these facilities may be said to include the right to enter depots and stations with loaded and empty wagons; the use of the platforms and space for the loading and unloading of express freight; sufficient space in suitable cars, drawn in passenger or quick trains, for the transportation of such freight; and a messenger in charge thereof, with room for its assortment while in transit, and a sufficient delay at stations for the delivery and receipt of express matter. *Southern Exp. Co.* v. *Iron, etc., Ry. Co.* 10 FED. REP. 213, 869; *Southern Exp. Co.* v. *Memphis, etc., Ry. Co.* 8 FED. REP. 802.

"Express facilities," from the nature of the business, cannot be limited to a definite space, but must correspond in this and other particulars to the public want and convenience to which the express company ministers.

In these cases there can be no difficulty for the present in ascertaining the facilities required by the plaintiff. For the purposes of this application they are such as it has heretofore been allowed. Under the restraining orders allowed on the filing of the bills, the defendants are now furnishing and the plaintiff is receiving just such facilities without any inconvenience to either party. But the third objection, that the defendants cannot be required under their charter and the laws of the state to afford the plaintiff the facilities demanded, or to give it a preference over shippers in the transportation of freight, is the one principally relied on by the defendants to defeat these applications for injunctions. Upon this point, the arguments and brief of counsel for defendants have left nothing unsaid in their behalf. Briefly, the argument is this: At common law, while a common carrier must carry for all at a reasonable compensation, which must be settled by the courts if not agreed on by the parties, still he may discriminate in his charges by carrying in some instances for less than a reasonable compensation, if he chooses. There is no statute in Oregon changing this rule of the common law, or requiring a corporation to transport freight in a passenger train, and in the custody or under the control of the shipper, therefore, the defendants cannot be

required to carry freight for the plaintiff at the same rate they may for others, or to furnish it any such facilities. In short, it is denied that either under the laws of Oregon or the past dealings between the parties, "it is the duty of the defendants to permit an express business to be done over their lines of transportation at all, in the manner required by the plaintiff," and therefore they may refuse to do so if they please.

In passing upon this question, at this preliminary stage of these cases, I do not deem it necessary to do more than to state my impression of the law as applicable thereto.

In the case of the *Southern Ex. Co.* v. *St. Louis, etc., Ry. Co.; Same* v. *Memphis, etc., Ry. Co.; Dinsmore* v. *Missouri, etc., Ry. Co.; Same* v. *Atchison, etc., Ry. Co.; Same* v. *Denver, etc., Ry. Co.,* 10 FED. REP. 210, arising in Missouri, Arkansas, Kansas, and Colorado, and lately heard together at St. Louis before Mr. Justice MILLER, of the supreme court, and Circuit Judge McCRARY, the defendants were perpetually enjoined from refusing or withholding the usual express facilities from the plaintiffs. In the opinion delivered by Mr. Justice MILLER it is stated that "the express business is a branch of the carrying trade that has, by the necessities of commerce and the usages of those engaged in transportation, become known and recognized," and sufficiently so "to require the court to take notice of it as distinct from the transportation of the large mass of freight usually carried on on steam-boats and railroads;" and "that the object of this express business is to carry small and valuable packages rapidly in such manner as not to subject them to the danger of loss and damage which to a greater or less degree attends the transportation of heavy or bulky articles of commerce, as grain, flour, iron, ordinary merchandise, and the like." And also that "it has become law and usage, and is one of the necessities of this business, that these packages should be in the immediate charge of an agent or messenger of the person or company engaged in it," without any right on the part of the railway company "to open and inspect" them; that it is "the duty of every railroad company to provide such conveyance by special cars or otherwise, attached to their freight or passenger trains, as are required for the safe and proper transportation of this express matter on their roads, and that the use of these facilities should be extended on equal terms to all who are actually engaged in the express business at fair and reasonable rates of compensation," to be determined by the court where the parties cannot agree thereon; and that a court of equity "has authority to compel the railroad com-

panies to carry this express matter and to perform the duties in that respect" as indicated.

Substantially the same conclusion had been reached by several other judges in the United States circuit courts in the same and similar cases reported in 2 FED. REP. 465; 3 FED. REP. 593; Id. 775; 4 FED. REP. 481; 6 FED. REP. 426; 8 FED. REP. 799.

The only case cited from the decisions of the federal courts to the contrary of these is *Chamblos* v. *Pa., etc., Ry. Co.* 4 Brewst. 563, in which a preliminary injunction was refused by Judge McKENNAN in a similar case; and also the case of *New England Exp. Co.* v. *Maine, etc., Ry. Co.* 57 Me. 194, and *Seargent* v. *Boston, etc., Ry Co.* 115 Mass. 416, in which the right of an express company to what are known as express facilities on the defendants' roads was denied. But the very decided weight and number of these authorities recognize the existence of the express business and the right of those engaged in it to have the proper facilities therefor allowed them by the defendants, and to secure the same by injunction in case they are refused. Until this question is settled by the supreme court, these deliberate decisions of co-ordinate tribunals, like the circuit courts, ought, except in an extreme case, to furnish a guide for the decision of this court. This is the rule that has been followed by justices of the supreme court on the circuit, (*Washburn* v. *Gould*, 3 Story, 133; *Brooks* v. *Bicknell*, 3 McLean, 250; *American, etc., Co.* v. *Fiber, etc., Co.* 3 Fisher, 363,) and in *Goodyear, etc., Co.* v. *Milles*, 7 O. G. 40, Judge EMMONS examines the question at some length, and concludes that "if one system of co-ordinate courts more than another calls for the application of these general principles, it is that of the circuit courts of the United States. * * * Although divided in jurisdiction, geographically, they constitute a single system, and when one court has fully considered and deliberately decided a question, every suggestion of propriety and fit public action, demand that it should be followed until modified by the appellate court."

However, my own impressions of the law are in harmony with these rulings. If the defendants were merely private common carriers, and the fact being admitted, which is manifest, that within the last 30 or 40 years persons or organizations known as expressmen or express companies have grown up in the country and introduced and are conducting the business of transporting a class of comparatively small but valuable packages over railway lines in special cars attached to passenger trains in the charge of an agent, the same being collected and delivered by said companies at points beyond the line or *termini*

of the railway, it would be their duty to furnish the usual facilities for such transportation over their lines. The obligation of a common carrier, as that of others who serve the public, may vary with the condition and circumstances of society. What is suitable and convenient in one age is not in another. The individuals who constitute the public have found it convenient to employ the express companies to transport certain articles for them instead of attending to it in person. So far, then, these companies represent the public, and as it has become an established usage and common method in the carrying trade to transport such packages in the charge of the shipper in a special car, on passenger time, they have the same right to demand and receive these facilities at the hands of the defendants as would any one of the individuals whom they represent. But the defendants are common carriers, and more. They are also corporations created by the state for the public use, and may be compelled to perform their corporate functions accordingly. True, the stock of the defendants is private property, and their business is directly managed by private persons of their own selection. But, nevertheless, the prime purpose of their creation and existence is to furnish the public suitable and convenient facilities for transportation of freight and passengers. It is the business of the state to establish and maintain highways, as means of transportation and communication within its borders, and to this end it created these defendants, authorized them to condemn private property to their use, to construct and operate their roads, and to take tolls for carrying freight and passengers thereon. *Talcott* v. *Township of Pine Grove*, 1 Flippin, 144; *People* v. *N. Y. Cent. Ry. Co.* (N. Y. Sup. Ct.) Daily Register, Feb. 10, 1883; *Ry. Co.* v. *Maryland*, 21 Wall. 470.

The defendants having been created by the authority of the state to serve the public as common carriers, cannot lawfully omit or refuse to perform their duty in this respect. They exist to do the business of a common carrier, and to do it in that way and manner which the law directs or the well-established usage of the country requires. For this service they are entitled to a reasonable compensation. But it can make no difference to them whether such compensation is paid directly by the owner of the package transported, or by the plaintiff as his bailee and agent. Neither is the business of the plaintiff in any sense or degree a burden or tax upon the corporate facilities or resources of the defendants. On the contrary, it is, from the very nature of things, of benefit to them; for, by reason of the special

means it uses to collect, care for in transit, and deliver the freight confided to its custody on and beyond the line of the railway, it must contribute materially to the volume and value of the business done thereon.

In considering this phase of the question I have laid out of view the allegation that the plaintiff has expended time and money in building up its express business on and over the defendants' lines of transportation, which it would be unjust and inequitable now to deny it the further use and benefit of. And I rest my conclusions on the fact, as stated by Mr. Justice MILLER, that the express has become a recognized branch of the carrying trade, and therefore the defendants, being corporations required and authorized by the state to serve the public as, and transact the business of, common carriers, are bound to furnish the plaintiff, as the agent, bailee, and representative of the public, so far, with the proper and usual facilities for doing this branch of such trade.

This makes it unnecessary to consider the fourth objection of the defendants, that the plaintiff is not, by reason of the facilities heretofore afforded it on existing lines of transportation, entitled to the relief sought as to any future extensions thereof. And this brings me to the consideration of the fifth and last objection, that the court has no power to determine the compensation to be paid by the plaintiff to the defendants for the services demanded. Counsel for the defendants rest this objection on the ground that the state, in and by section 36 of the corporation act, has contracted with the defendants that they may charge such tolls as they may see proper, and that, therefore, they cannot be required to carry freight for the plaintiff on any other terms or conditions.

Section 2 of article 11 of the state constitution is also cited. It provides that corporations, except municipal ones, shall not be created by special laws; and "all laws passed pursuant to this section may be altered, amended, or repealed, but not so as to impair or destroy any vested corporate rights."

Section 36 of the corporation act (Or. Laws, 532) provides:

"Every corporation formed under this chapter for the construction of a railway, as to such road, shall be deemed common carriers, and shall have power to collect and receive such tolls or freights for the transportation of persons or property thereon as it may prescribe."

It is not apparent that this constitutional provision has any bearing on the question under consideration. The legislature has not undertaken to repeal or modify section 36 of the corporation act, and

this court is bound in the mean time to allow it full force and effect. If it constitutes a contract between the state and the defendants, by which they are absolutely and perpetually authorized to fix their own charges for transportation, as claimed by their counsel, it is protected from hostile legislation by section 10 of article 1 of the federal constitution. But if it is not a contract at all, but a mere permission for the time being, then it is not a vested right, but a matter subject to the power of the legislature. However this may be, it is in the mean time a law of the state applicable to the subject of the right of the defendants to take tolls, which this court must construe and give effect to accordingly.

And, first, the right to take tolls on a highway is an attribute of sovereignty, and cannot be exercised by the defendants without the authority of the state. It may be said that the authority to form a corporation to construct and operate a highway, as a common carrier, impliedly gives the right to take reasonable tolls for traffic thereon. But this has not always been conceded, and it is probable that the clause concerning tolls was inserted in this section primarily to authorize the taking of tolls at all, and then, for the time being at least, only in such amount as the corporation might *prescribe;* that is, fix and set down beforehand, and not according to the whim or caprice of each occasion. *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 544. Again, the legislature, in enacting this section, is presumed to have acted with knowledge of and reference to the fact that by the common law a common carrier was only entitled to a reasonable compensation for his services.

The reasonable inference from the circumstances is that the legislature, in consideration of the premises, intended to confer upon the corporation, so long as it maintained and operated its road as a highway, conducted by a common carrier, at least the authority to take reasonable tolls; in other words, the duty and obligation of a common carrier being imposed on the defendants, they were granted the corresponding privilege of charging a reasonable compensation for their services. And so far, I think, this section is a contract between the state and the defendants, the obligation of which it is beyond the power of the latter anywise to impair, (section 10, art. 1, U. S. Const.,) or any court to disregard. But, in my judgment, the section was not intended to do more than this, and ought not to be otherwise construed. It is a license or grant to the defendants upon sufficient consideration to take such tolls for freight and passengers as are consistent

.with the duty and obligation they owe to the public as common carriers.

It is well settled that a grant of this kind is never to be construed beyond its plain terms, or contrary to the manifest reason of it; and if there is a reasonable doubt as to its scope or meaning, that doubt must be resolved in favor of the public or state. *Charles River Bridge* v. *Warren Bridge, supra,* 544, 600; Cooley, Const. Lim. 394, and the cases there cited. And this question seems in effect to have been similarly disposed of by Mr. Justice MILLER in the case of the *Southern Express Co.* v. *St. Louis, etc., Ry. Co.* 10 FED. REP. *supra.* For, in the answer of the defendant, as appears from a quotation therefrom in the brief of counsel for the plaintiff, it is stated that under its charter it was authorized to transport all articles usually carried on railways, .and "to charge and receive such tolls and freights" therefor "as shall be to the interest of the same, and that the directors of the defendant are therein authorized to establish such tolls, and to alter the same from time to time;" and in the opinion allowing the final injunction he says, (10 FED. REP. 215:) "I am of the opinion that neither the statutes nor constitutions of Arkansas or Missouri were intended to affect the right asserted in these cases; nor do they present any obstacle to such decrees as may enforce the rights of the express companies." Under the circumstances, this language can only be understood as a decision that the grant to the Missouri corporation to take tolls in similar if not stronger language than the Oregon one, is to be taken and considered as a grant to take only reasonable tolls.

The question of the power or right of the defendants to engage in the express business at all, at least the accessorial service of collecting and distributing packages off their lines of transportation, has been argued also, but it is not necessary now to consider it. The plaintiff does not ask to exclude the defendants from the business, but only that it may be permitted to carry it on as heretofore.

On the whole, I am of the opinion that the plaintiff is entitled to the relief sought, and therefore ought to be secured by injunction, until the final hearing, in the use of the facilities for conducting its . business heretofore allowed it by the defendants.

A special reason for allowing the provisional injunction is also found in the fact that by exacting the proper security from the plaintiff, the defendants will not be injured, even if it should be finally determined that the plaintiff is not entitled to relief; while if the in-

junction is not now allowed, its business will be like water spilled on the ground—irredeemably destroyed. Kerr, Inj. 212.

The defendants being secured by the operation of section 36 of the corporation act, as now construed, in the right to take reasonable tolls, the question of what is reasonable must, unless the parties can agree about it, be determined by the court. But, for the purpose of the provisional injunction, the court will assume that the compensation heretofore paid by the plaintiff to the defendants for express facilities, is reasonable, and will require the defendants to furnish them during the pendency of the suit, or until further order of the court, upon their lines of transportation, and the extensions of them, at the same rates.

Let an injunction issue commanding and restraining the defendant in each case, as prayed for in the bill; the plaintiff first giving bond, with sufficient sureties, to be approved by the master of this court, in the sum of $20,000, conditioned to pay the defendant a reasonable compensation from time to time for such facilities as heretofore, and all damages which the defendant may sustain by reason of this injunction, if the same shall be adjudged wrongful, to be ascertained by a reference or otherwise, as this court may direct. *Russell* v. *Farley,* 105 U. S. 443.