ATLANTIC & P. R. CO. v. UNITED STATES.

(District Court, S. D. California. August 11, 1896.)

1. RAILROAD RATES—CONTROL BY CONGRESS.
   The presumption that a rate fixed by congress is reasonable cannot be overcome except by some showing as to expenses and receipts during an adequate period.

2. SAME—CONSTRUCTION OF CHARTER.
   Act July 27, 1866 (Atlantic & Pacific Railroad Company Charter) § 13, provided that the directors of the company "shall, from time to time, fix, determine, and regulate the fares, tolls, and charges to be received and paid for transportation of persons and property." Held, that the government did not thereby renounce its right to reasonably limit the charges for transportation of persons and property over such railroad.

3. SAME.
   The proviso, in section 5 of said act, that the company shall not charge the government higher rates than individuals for like transportation, did not affect the right of the government to further limit the rates to be charged to it.

4. SAME.
   Nor was the right of the government to limit charges affected by section 11, providing that the road should "be a post route and military road, subject to the use of the United States for postal, military and all other government service, and also subject to such regulations as congress may impose restricting the charges for such government transportation."

5. SAME.
   A reservation in the charter of the power, "having due regard to the rights of said" company, to "add to, alter, amend, or repeal this act," empowered congress to regulate the freights and fares, and this could properly be done by an act applying to all land-grant railroads, prescribing a maximum charge for government transportation.

C. N. Sterry and W. F. Herrin, for plaintiff.
George J. Denis, U. S. Atty., and Joseph H. Call, Special Asst. U. S. Atty.

WELLBORN, District Judge. This suit is brought to recover charges made by the plaintiff for transportation of a private soldier in the regular army of the United States from Albuquerque, N. M., to Prescott Junction, Ariz., over the railroad operated by plaintiff, of which a part was constructed by plaintiff, and a part operated under arrangement with other companies. The transportation service was performed by plaintiff on the 30th and 31st days of October, 1892. While the amount herein sued for is inconsiderable, counsel for the government suggests that the sums ultimately to be affected by the precedent which the case establishes will aggregate many millions of

dollars. Jurisdiction of this court over the suit, as conceded by defendant, is derived from the act of congress of March 3, 1887, entitled "An act to provide for the bringing of suits against the United States" (Supp. Rev. St. U. S. p. 559). The controversy between the parties, as will fully appear later on, is limited to the question whether defendant is liable to plaintiff for the whole or only a part of the amount sued for. Under an assumption of counsel and the court that this issue was disclosed by the complaint itself, a general demurrer thereto was argued orally, some time ago, and submitted on briefs filed respectively by the plaintiff, the defendant, and, on special leave, the Southern Pacific Railroad Company. It appearing, however, upon a careful examination of the pleadings, that said issue was not then properly before the court, for the reason that the petition showed an admitted liability for part of the sum demanded, the demurrer, by consent of the defendant, was overruled, and an answer subsequently filed. The present hearing is a trial upon the merits by the court without a jury, as provided for in section 2 of the aforesaid act of congress, and involves, with one other, the same questions that were argued on demurrer, and therefore the briefs then filed are now applicable.

The material facts and pertinent statutes, other than those above mentioned, are as follows: Plaintiff is a corporation created by an act of congress entitled "An act granting lands to aid in the construction of a railroad and telegraph line from the states of Missouri and Arkansas to the Pacific coast," approved July 27, 1866 (14 Stat. 292). Section 1 of said act constitutes certain persons, therein mentioned, a body politic and corporate, under the name of the Atlantic & Pacific Railroad Company, and provides, among other things, as follows:

"And said corporation is hereby authorized and empowered to lay out, locate, and construct, furnish, maintain, and enjoy, a continuous railroad and telegraph line, with the appurtenances, namely: Beginning at or near the town of Springfield, in the state of Missouri, * * * thence by the most practicable and eligible route, to the Pacific. * * * And the said company is hereby vested with all the powers, privileges, and immunities necessary to carry into effect the purposes of this act, as herein set forth."

Section 3 grants to the Atlantic & Pacific Railroad, "for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway and its branches," 20 sections per mile, on each side of said railroad line, through the territories, and 10 alternate sections of land per mile on each side of said railroad wherever it passes through any state; and provides "that no money shall be drawn from the treasury of the United States to aid in the construction of the said 'Atlantic and Pacific Railroad.' "

Sections 5, 11, 13, and 20 are as follows:

"Sec. 5. And be it further enacted, that said Atlantic and Pacific Railroad shall be constructed in a substantial and workmanlike manner, with all the necessary draws, culverts, bridges, viaducts, crossings, turn-outs, stations, and watering-places, and all other appurtenances, including furniture and rolling stock, equal in all respects to railroads of the first-class when pre-

pared for business, with rails of the best quality, manufactured from American iron. And a uniform gauge shall be established throughout the entire length of the road. And there shall be constructed a telegraph line, of the most substantial and approved description, to be operated along the entire line: Provided, that the said company shall not charge the government higher rates than they do individuals for like transportation and telegraphic service. And it shall be the duty of the Atlantic and Pacific Railroad Company to permit any other railroad which shall be authorized to be built by the United States, or by the legislature of any territory or state in which the same may be situated, to form running connections with it, on fair and equitable terms."

"Sec. 11. And be it further enacted, that said Atlantic and Pacific Railroad, or any part thereof, shall be a post route and military road, subject to the use of the United States for postal, military, naval, and all other government service, and also subject to such regulations as congress may impose restricting the charges for such government transportation."

"Sec. 13. And be it further enacted, that the directors of said company shall make and publish an annual report of their proceedings and expenditures, verified by the affidavits of the president and at least six of the directors, a copy of which shall be deposited in the office of said secretary of the interior, and they shall, from time to time, fix, determine, and regulate the fares, tolls, and charges to be received and paid for transportation of persons and property on said road or any part thereof."

"Sec. 20. And be it further enacted, that the better to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government, at all times, but particularly in time of war, the use and benefits of the same for postal, military and other purposes, congress may, at any time, having due regard for the rights of said Atlantic and Pacific Railroad Company, add to, alter, amend, or repeal this act."

In the years 1869, 1870, and 1871, plaintiff surveyed and located a line of road, from Springfield, Missouri, and through New Mexico, Arizona, and California, to the Pacific Ocean. In the years 1882 and 1884, and along the line so located, plaintiff constructed a railroad, between Isleta Junction, N. M., and Needles, near the Colorado river, in California. Isleta Junction is fifteen miles southwesterly from Albuquerque, upon the main line of road, and the soldier was transported from Albuquerque, through Isleta, and thence to Prescott Junction, Ariz.; so that, of the road over which said soldier was transported, that part between Isleta and Prescott Junction was constructed under said act of congress, and is, therefore, a land-grant railroad, while that part east of Isleta, to Albuquerque, was built by another company, and, so far as the purposes of this action are concerned, is not a land-grant railroad. Plaintiff has not constructed any part of the line between Springfield, Mo., and Isleta Junction, N. M., nor between Needles, Cal., and the Pacific Ocean. Plaintiff has received no government bonds to aid in the construction of its road.

By an act of congress entitled "An act making appropriations for the support of the army for the fiscal year ending June 30, 1893, and for other purposes," approved July 16, 1892, rates were established for army transportation over land-grant railroads for the year ending June 30, 1893. Acts 52d Cong. 1st Sess. (27 Stat. 174–183). The pertinent provisions of this act are as follows:

"For the payment of army transportation lawfully due such land-grant railroads as have not received aid in government bonds (to be adjusted in

accordance with the decisions of the supreme court in cases decided under such land-grant acts), but in no case shall more than fifty per centum of the full amount of service be paid; in all two million seven hundred thousand dollars; provided, that this compensation shall be computed upon the basis of the tariff or lower special rates for like transportation performed for the public at large, and shall be accepted as in full for all demands for such service; provided, further, that in expending the money appropriated by this act, a railroad company which has not received aid in bonds of the United States, and which obtained a grant of public land to aid in the construction of its railroad on condition that such railroad should be a post route and military road subject to the use of the United States for postal, military, naval and other government services; and also, subject to such regulations as congress may impose, restricting the charges for such government transportation, having claims against the United States for transportation of troops and property over such aided railroads, shall be paid out of the money appropriated by the foregoing provision only on the basis of such rate for the transportation of such troops and munitions of war and military supplies and property as the secretary of war shall deem just and reasonable under the foregoing provision, such rate not to exceed fifty per centum of the compensation for such government transportation as shall at the time be charged to and paid by private parties to any such company for like and similar transportation; and the amount so fixed to be paid shall be accepted as in full for all demands for such service."

Pursuant to this act of congress, the secretary of war established rates for army transportation over plaintiff's railroad, so far as said road was aided by a land grant, at 50 per centum of its regular tariff rates. The distance, as already stated, between Albuquerque and Isleta Junction, by rail, is 15 miles, and the total distance between Albuquerque, N. M., and Prescott Junction, Ariz., over which line this soldier was transported, is 428 miles; so that the distance between Isleta Junction and Prescott Junction is a distance of 413 miles. Before the transportation services in question were rendered, plaintiff's board of directors had fixed the fare for first-class passengers from Albuquerque to Prescott Junction at the sum of $25.70 per passenger, and had fixed the rate of transportation for first-class passengers between Albuquerque and Isleta Junction at 70 cents per passenger, so that the regular tariff rate of the company between Isleta Junction and Prescott Junction was and is $25; and the petition alleges that the fare so fixed by its board of directors was reasonable. Defendant, prior to the commencement of the action, tendered to plaintiff the sum of $13.23, and has since kept the tender good. The rate fixed by congress— one-half of the regular tariff rate fixed by plaintiff's board of directors from Isleta Junction to Prescott Junction—is $12.50, and, adding to this the full rate fixed by said board of directors, over the unaided part of the road between Albuquerque and Isleta Junction, 70 cents, makes the aggregate of $13.20,—3 cents less than the amount of the aforesaid tender. There is no allegation in the petition that the rate thus established and tendered by the government was unreasonable, unless implied from the allegation that the rate fixed by plaintiff's board of directors was reasonable.

The question to be now decided is aptly stated in plaintiff's brief, as follows:

"Whether, when the rates to be charged by the plaintiff for transportation over its line have been determined and fixed by its board of directors, the

secretary of war can, under the provisions of said act of congress of July 16, 1892, fix the rate for the transportation of soldiers carried as passengers by plaintiff over its road at a less rate than that determined and fixed by its board of directors."

For the purposes of this question, the rate fixed by the secretary of war will be deemed reasonable. I am not sure that there is anything in the pleadings to the contrary. It is doubtful, to say the least, if the averment of the petition that the rate for the public at large, fixed by plaintiff's board of directors, was reasonable, can be held to charge, by implication, unreasonableness upon the rate for the government, fixed by the secretary of war. May it not be that, in view of the amount of business the government gives to the company, or for other cause, a rate against the government, to be reasonable, should be less than a rate against the public generally? Interstate Commerce Commission v. Baltimore & O. R. Co., 145 U. S. 263, 12 Sup. Ct. 844. Conceding, however, as I have done by overruling defendant's objections to the oral evidence offered on behalf of plaintiff, that the petition and answer properly raise the issue, then I hold that said evidence is insufficient to establish unreasonableness in the government rate. But one witness was introduced to the point, and he simply stated that the rate fixed by the plaintiff was reasonable. As already indicated, it is by no means clear that this statement implied that the government rate was unreasonable. Ascribing even that significance, however, to the statement, it is insufficient as proof, because merely an opinion of the witness, unfortified by any presentation of facts, and involving questions of law, and could, perhaps, without error, have been excluded as incompetent. The supreme court of the United States has uniformly held that a rate legislatively prescribed is, prima facie at least, reasonable. In the case of Ruggles v. Illinois, 108 U. S. 541 (2 Sup. Ct. 835), Mr. Justice Field said:

"I concur in the judgment in this case solely on the ground that no proof was made that the rate prescribed by the legislature was unreasonable. Under previous decisions of the court, the legislative rate is to be taken as presumptively reasonable."

Without undertaking to define the words "reasonable" and "unreasonable," it is sufficient now to say that the presumption that a rate fixed by congress is reasonable cannot be overcome, except by some showing of figures and other facts as to the earnings of the road in question; that is, expenses and receipts, during an adequate period. Railroad Co. v. Wellman, 143 U. S. 339–346, 12 Sup. Ct. 400; Dow v. Beidelman, 125 U. S. 680–690, 8 Sup. Ct. 1028; Budd v. New York, 143 U. S. 517–552, 12 Sup. Ct. 468; Reagan v. Trust Co., 154 U. S. 401, 14 Sup. Ct. 1047. No such showing was made or attempted on this trial. Plaintiff's claim therefore depends upon the proposition that plaintiff has a right, limited only by the proviso of section 5 of the act of congress of July 27, 1866, and subject to the powers reserved in section 20 of said act, to fix and determine its freights and fares, free from legislative restriction. With reference to the reserved powers of section 20, plaintiff insists that, whatever may be their extent, they can be exercised

only through legislation which expressly repeals or amends the act, and that, therefore, the right conferred by said act to fix and determine charges for transportation is not restricted, or in any way affected, by the general provisions of the army appropriation bill of 1892, hereinbefore cited. Of these reserved powers, in their relation to this army appropriation bill, I shall make further mention later on. The question first and now to be decided is whether or not the plaintiff, by virtue of the provisions of its charter, has an absolute right to control its traffic rates, within the limitations above indicated. This right plaintiff asserts, and claims to derive from section 13 of the act last mentioned. The salient part of plaintiff's argument on this branch of the case, quoted from its brief, is as follows:

"We believe that under the provisions of this charter congress absolutely gave to the plaintiff the full power to 'fix' and 'determine' its rates of charges for transportation of persons and things, and that such power is not under legislative control of either congress. or any state or territory, outside of the possible right of congress to alter or repeal the right so granted, under the reserved powers contained in section 20. If the statute had simply provided that the company should have a right to 'fix' the rates, then it could well be said that this right was simply the right to 'fix' reasonable rates, and that congress, by any general law. might itself, under the reserved power of the sovereign. 'determine.' prima facie at least, what were and are reasonable rates. Stone v. Trust Co., 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191. The addition of the word 'determine' to the grant of power relative to the right to 'fix' rates gave to the company a grant of power such as would take it out of the principles determined in the case last cited. The word 'determine,' as used in plaintiff's charter, means a greater power than that granted by the word 'fix,' and different from the word 'regulate.' The word 'determine' is defined by the various authorities as follows: 'To fix the determination of, to limit. to bring to an end, to finish. to ascertain definitely, to bring to a conclusion, as a question of controversy; to settle by authoritative or judicial sentence. to decide, as "the court determined the cause"; to come to a decision. to conclude.' Webster's Unabridged Dictionary. 'To settle, to ascertain or state definitely; to decide upon, as after consideration or investigation: to bring to a conclusion. to put an end to, as a dispute, by judicial or other final decision: as "the court determined the cause." ' Century Dictionary (volume 2). 'To bring to an end; to determine.' Soule's Synonyms. 'To end; to decide: resolve; to come to a decision. It is synonymous with finish. resolve, conclude.' Stormouth's Dictionary of English Words. 'To end. to terminate, settle, decide; as to determine and conclude a controversy.' Anderson's Dictionary of Law. 'To fix permanently; to settle; to adjust, terminate. or bring to an end.' 5 Am. & Eng. Enc. Law. 650. The word 'determine' is properly and usually used in conferring upon executive, administrative, and judicial officers the power to finally settle and conclude controversies. To say that the word 'determine,' in this statute, means only the same thing as the words 'fix' and 'regulate,' is to discard from the statute a word placed there by the legislature, and to say that the legislature intended nothing by the use of such a word."

In order to weigh this argument correctly, it is necessary to understand in the outset what the power of the federal government, when unaffected by statutory enactment, is, over charges for railroad transportation. and also the rule of construction applicable to statutes affecting, or claimed to affect, that power. The late Chief Justice Waite authoritatively stated the power and rule, with reference to a state, thus:

"It is now settled in this court that a state has power to limit the amount of charges by railroad companies for the transportation of persons and

property within its jurisdiction, unless restrained by some contract in the charter, or unless what is done amounts to a regulation of foreign or interstate commerce. Baltimore & O. R. Co. v. Maryland, 21 Wall. 456; Chicago, B. & Q. R. Co. v. Iowa, 94 U. S. 155; Peik v. Railroad Co., Id. 164; Railroad Co. v. Blake, Id. 180; Ruggles v. Illinois, 108 U. S. 531, 2 Sup. Ct. 832. This power of regulation is a power of government continuing in its nature; and if it can be bargained away at all it can only be by words of positive grant, or something which is in law equivalent. If there is reasonable doubt, it must be resolved in favor of the existence of the power. In the words of Chief Justice Marshall in Bank v. Billings, 4 Pet. 560: 'Its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon it does not appear.' This rule is elementary, and the cases in our reports where it has been considered and applied are numerous. * * * 'The surrender, when claimed, must be shown by clear and unambiguous language, which will admit of no reasonable construction consistent with the reservation of the power.' * * * From what has been said, it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights, the state cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of property for public use without just compensation, or without due process of law." Stone v. Trust Co., 116 U. S. 307, 6 Sup. Ct. 342.

In another place the same distinguished jurist enunciated the rule as follows:

"Grants of immunity from legitimate governmental control are never to be presumed. On the contrary, the presumptions are all the other way; and, unless an exemption is clearly established, the legislature is free to act on all subjects within its general jurisdiction as the public interests may seem to require. As was said by Chief Justice Taney, speaking for the court, in Charles River Bridge v. Warren Bridge, 11 Pet. 547: 'It can never be assumed that the government intended to diminish its power of accomplishing the end for which it was created.' This is an elementary principle." Ruggles v. Illinois, 108 U. S. 536, 2 Sup. Ct. 835.

To same effect, see, also, Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 702; Dow v. Beidelman, 125 U. S. 680, 8 Sup. Ct. 1028; Reagan v. Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047.

This power of regulation which a state has over railroad charges on traffic entirely within its boundaries congress possesses when the traffic is between states, or between states and territories, or in territories. Covington & C. Bridge Co. v. Kentucky, 154 U. S. 205, 14 Sup. Ct. 1087; First Nat. Bank of Brunswick v. County of Yankton, 101 U. S. 129; Late Corporation of Church of Jesus Christ of Latter-Day Saints v. U. S., 136 U. S. 1, 10 Sup. Ct. 792.

Bearing in mind this general power of governmental control, and the rule of construction applicable to statutes which are claimed to affect that power, let us now consider plaintiff's argument. Is it true that by the provisions of section 13 of plaintiff's charter (the act of congress of July 27, 1866), the government renunciated and bargained away its right to reasonably limit the charges for transportation of persons and property over plaintiff's line of railroad? Can it be said that the surrender of the right or power in question has been "shown by clear and unambiguous language, which will admit of no reasonable construction consistent with the reservation of the power"? Certainly there is no express

renunciation, and it can result by implication only on the theory that congress, by the use, in the section aforesaid, of the words "fix" and "determine," intended that the actions designated by those words should be final, and therefore exempt from governmental supervision. Plaintiff admits that the word "fix" does not imply such a result, but contends that the implication necessarily arises from the word "determine." In this contention I am unable to concur, and do not think it is sanctioned, at least uniformly, even by the definitions approvingly quoted in plaintiff's brief. Before examining these definitions, and as preliminary thereto, it will be appropriate to notice two decisions of the supreme court of the United States, in which, indirectly, is attached to the word "determine" a meaning just the opposite of that for which plaintiff contends. In the case of Ruggles v. Illinois, 108 U. S. 536, 2 Sup. Ct. 837, the special provision of the charter in controversy read as follows:

"The board of directors shall have power to establish such rates of toll for the conveyance of persons or property upon the same as they shall from time to time by their by-laws determine, and to levy and collect the same for the use of the company."

The supreme court held that this language was not a renunciation of state regulation over the subject. It is true that the ruling was made upon the ground that it was provided elsewhere in the same act that the by-laws of the company should not be "repugnant to the constitution and laws of the United States, or of this state, or repugnant to this act." The case, however, is useful here, as showing that the word "determine," when applied to the action of a board of directors, does not mean that such action is final, in the sense that it cannot be reviewed by some other tribunal or body. Again, in the case of Illinois Cent. R. Co. v. Illinois, 108 U. S. 541, 2 Sup. Ct. 839, the provision in question was as follows:

"The board of directors shall have power to establish such rates of toll for the conveyance of persons and property upon the same as they shall from time to time, by their by-laws, direct and determine, and to levy and collect the same for the use of said company."

Upon the same line of reasoning as that adopted in Ruggles v. Illinois, supra, the supreme court held that this language did not exempt the rates fixed by the company from legislative supervision. Here, again, the word "determine" is employed to denote an action by the board of directors which was subject to the control of the legislature, and therefore not final, as contended for by plaintiff.

Recurring now to the definitions adopted in plaintiff's brief, we find that some of them, at least, in harmony with the two cases above cited, strongly negative the idea that the word "determine" signifies final, conclusive action. For instance, one of the definitions is, "to decide; as, 'the court determined the cause.'" Now, all know that the decision of a court may or may not be final, and to say that "the court has determined a case" does not always, or even usually, imply that the decision is, in law, an end of the litigation. Indeed, this inference would not be legitimate in any case where the court rendering the decision is generally subordinate to another tribunal; and

such, so far as rates of transportation are concerned, is practically the relation between a board of directors of a railroad company and the legislature of the government within whose jurisdiction the company operates. It is a somewhat striking coincidence that in the very statute cited in this opinion, at pages 1 and 2, which plaintiff invokes, and successfully, as authority for its present suit against the United States, congress has used the word "determine" for a purpose analogous to that of its employment in plaintiff's charter, assuming the charter provision to be a grant of power, and with a meaning which is clearly opposed to that now insisted upon by plaintiff. Section 2 of said act provides: "That the district courts of the United States shall have concurrent jurisdiction with the court of claims as to all matters named in the preceding section," etc. The preceding section enacts as follows: "That the court of claims shall have jurisdiction to hear and determine the following matters," etc. Yet, although authority is thus conferred upon said courts to "determine" the matters in said act committed to them, their judgments are not final, but subject to review in appellate jurisdictions. So, too, where power is granted to the directors of a railroad company "to determine" its rates of transportation, as was the fact in Ruggles v. Illinois, supra, and Illinois Cent. R. Co. v. Illinois, supra, such grant, unless otherwise clearly expressed, or unavoidably implied, is made subject to, rather than in renunciation of, governmental control.

There is another view of section 13, in its relations to other provisions of plaintiff's charter, which strengthens my faith in the conclusion which I have reached as to the significance of the word "determine." Thus far I have treated the provisions of section 13 of plaintiff's charter as grants of power. Careful reading and study, however, of the whole act, convince me that said section was not designed to grant powers, but, rather, to impose limitations upon powers previously granted to the company. These powers are clearly granted in section 1, as follows:

"And said corporation is hereby authorized and empowered to lay out, locate and construct, furnish, maintain and enjoy, a continuous railroad," etc. "And the said company is hereby vested with all the powers, privileges and immunities necessary to carry into effect the purposes of this act, as herein set forth."

Here is given, not expressly, but by unavoidable inference, the power to transport persons and property, and to charge therefor such rates as the company may deem proper, subject to the common-law limitation that the rates charged shall be reasonable. Railroad Co. v. Blake, 94 U. S. 180. It should be further and particularly observed that the phraseology of this section is that which is precisely adapted to, and usually employed for, the delegation of power, namely, "and said corporation is hereby authorized and empowered," etc., "and the said company is hereby vested with all powers," etc. Such, however, is not the case with section 13. The words there employed are not words of grant, but of limitation. The section does not purport to delegate a power, but, on the contrary, clearly imposes a duty with reference to a power already existing in the company, by prescribing the manner in which the power shall be exer-

cised. The first clause provides "that the directors shall make and publish an annual report of their proceedings and expenditures, verified by the affidavits," etc. Will it be claimed for a moment that this clause was intended to confer upon the directors power to make and publish the report referred to? Certainly not. The power they already possessed. The object of the provision was to require its exercise in a particular manner. The same is true of the latter clause of the section: "And they shall, from time to time, fix, determine and regulate the fares, tolls and charges to be received and paid for transportation of persons and property," etc. The manifest object of this clause was not to grant, but to point out and limit the manner in which a power already granted should be exercised; that is, the rates should be fixed and determined in advance of the services rendered, and not capriciously, or according to the supposed exigency of each occasion. This explanation of the object and scope of section 13, namely, that it is restrictive, and not an enlargement of the grants made in section 1, is itself, it seems to me, a complete answer to so much of plaintiff's argument as relates to the word "determine."

In this connection, there is another circumstance worthy of notice, and it is this: The Southern Pacific Railroad Company, directly concerned in the questions of law involved, and upon the same side with plaintiff, in its brief upon the pending demurrer, submitted by consent of parties and leave of the court, makes the following statements:

"Perhaps section 13 should be construed with the common-law limitation that the railroad company, as a common carrier, though having the power to fix rates, has no power to fix grossly unreasonable or exorbitant rates; and that a general limitation of rates may be imposed by the legislature in the exercise of police power. Wells v. Navigation Co., 15 Fed. 561; Stone v. Trust Co., 116 U. S. 307, 6 Sup. Ct. 334." See page 9 of brief.

And also:

"Sections 3, 5, and 13 of the Atlantic & Pacific act should be considered in the light of a contract between the railroad company and the government, requiring of it in its ordinary service 'the safe and speedy transportation of the mails, troops, munitions of war, and public stores,' whenever required by the government, subject to its ordinary charges for like services to the most favored classes of individuals, as fixed by its board of directors, with the implied proviso that those charges are not unreasonable or exorbitant. Wells v. Navigation Co., 15 Fed. 561-573; Ex parte Koehler, 23 Fed. 529, 531." See page 23 of brief.

And again, on page 27 of said brief, the government's contract with the company is spoken of as a contract "to the effect that the company should have the power, within reasonable limits, to fix and determine uniform rates for all services of like character rendered by it as a common carrier," etc. The words "within reasonable limits" are emphasized in the brief by the use of italics. These extracts admit that there is some limitation upon the company's power over transportation rates, and, to this extent, antagonize the meaning plaintiff gives to the word "determine."

In further support of this meaning, plaintiff, at page 8 of its brief, asserts that the proviso in the fifth section of its charter,—

the act of July 27, 1866,—as follows: "Provided, that the said company shall not charge the government higher rates than they do individuals for like transportation and telegraphic service,"—shows "that congress understood that it absolutely vested in the board of directors the power to finally determine rates of fare," and then adds: "If congress understood that it had reserved to itself the power to, at all times, fix the charges for the services that the railroad company might perform for the government, this proviso in the fifth section was, and is, an absurdity. To give full force and effect to all parts of the act necessarily compels giving force and effect to this proviso, and to give to it force and effect is to concede the proposition contended for by us." I fail to discern the inconsistency here asserted between a present limitation, which the proviso mentioned imposes, and reserved power in the government to make additional limitations if future exigencies should require. After the enactment of the company's charter, further governmental restriction upon rates could, of course, be imposed only by legislation, additional and subsequent to the charter. Such legislation might or might not be required. This, obviously, would depend upon whether the rates thereafter to be fixed and determined by the company were satisfactory or otherwise to the government; and must, of necessity, be left to the developments of the future. In the meantime there was one limitation which congress thought it expedient to impose at once, namely, that the government should not be charged higher rates than individuals for like transportation and telegraphic service. The imposition of this restriction did not preclude further regulations by congress; otherwise there has been accomplished what the authorities uniformly declare cannot be done,—the surrender of a high power of government by uncertain and ambiguous implication.

My conclusion, as already indicated, is that the right of plaintiff, under its charter, and without reference to section 20, to fix and determine its freight and fares, is not absolute and unrestricted, but subject to congressional limitation, within the bounds of reasonableness; and that, since the rate fixed by the secretary of war, according to authorities cited, is presumptively reasonable, and there is no sufficient proof of unreasonableness, said rate is a lawful restriction, and plaintiff's charge in excess thereof an unlawful charge.

There is another ground, which, I think, will support the judgment to be entered herein, and it is that, whatever construction may be placed upon section 13 of the plaintiff's charter, congress, under the reserved powers of section 20, has the right, within reasonable limits, of course, to regulate the freights and fares fixed and determined by plaintiff's board of directors; and that the provisions of the army appropriation bill of 1892, prescribing a maximum charge for government transportation, although of general application, are a legitimate exercise of these reserved powers. It is not my purpose to discuss this ground, but simply to refer to some of the authorities by which, in my judgment, it is supported. These are the cases of U. S. v. Union Pac. Ry. Co., 160 U. S. 1, 16 Sup. Ct. 190; Peik v. Railroad Co., 94 U. S. 164; Shields v. Ohio,

95 U. S. 319. It is true that in the two cases last cited, the power of amendment and repeal was reserved without qualification, but I hardly think it can be claimed that the condition attached to the reservation in section 20 of plaintiff's charter, which requires "due regard for the rights of said Atlantic and Pacific Company," is violated by the imposition of a reasonable limit upon the company's rates. Indeed, the supreme court, speaking directly to this question, in U. S. v. Union Pac. Ry. Co., says:

"No express limitation is imposed upon the exercise of the power so reserved, except that the act of 1862 required that due regard be had to the rights of the railroad companies that accepted its provisions. But, looking at the entire act, it is clear that there was no purpose to interfere with the authority of congress to enact such laws by way of addition to or alteration of existing legislation as were necessary or conducive to the attainment of the public objects sought to be attained. Indeed, the words in the act of 1862, 'due regard for the rights of said companies named therein,' suggest only such restrictions as the law, without such words, would imply." U. S. v. Union Pac. Ry. Co., 160 U. S. 1, 16 Sup. Ct. 202.

The case of Shields v. Ohio, supra, is particularly in point, as the act prescribing the maximum was a general act, applicable to all railroads, and did not purport specially to repeal or alter the charter of the particular company whose rates were involved in the litigation. In that case, the supreme court says:

"The constitutional provision that no 'special privileges or immunities shall ever be granted that may not be altered, revoked, or repealed by the general assembly,' entered into the acts under which the consolidations were made, and rendered the corporations created and the franchises conferred subject to repeal and alteration, just as if they had been expressly declared to be so by the act. The act of 1873, in the particular in question, was a legitimate exercise of the reserved power of alteration, and was, therefore, valid. Parker v. Railroad Co., 109 Mass. 506."

See, also, Spring Valley Waterworks v. Schottler, 110 U. S. 347, 4 Sup. Ct. 48; Water Co. v. Clark, 143 U. S. 1, 12 Sup. Ct. 346; Stone v. Wisconsin, 94 U. S. 181. In this latter case the alteration was effected by a general statute.

The foregoing views render it unnecessary for me to pass upon the other points that have been argued. With reference, however, to section 11 of plaintiff's charter, it is appropriate to observe that, no matter what meaning be ascribed to that section, it will not conflict with the constructions which I have placed upon other parts of the act. If the section applies to government transportation, when effected by plaintiff in the ordinary operation of its road, then, of course, the rate fixed by the secretary of war pursuant to the army appropriation bill of 1892 has express warrant in the power of regulation reserved in the latter clause of the section. If, however, the section be held, as plaintiff, upon the authority of Lake Superior & M. R. Co. v. U. S., 93 U. S. 442–460, insists it should be held, to contemplate direct occupancy and use of the road by the government for public purposes, and to apply only in that event, then it follows that the supervisory power of the government over freights and fares, while the road is operated by plaintiff, through its usual agencies and methods, is unaffected by said section. Governmental occupancy and use of a railroad, without an agreement

therefor between the government and owner, would be an appropriation of private property to public purposes, wholly outside the scope of the supervisory power above mentioned, and lawfully accomplishable only through an exercise of the right of eminent domain. Probably it was for this reason, quoting from Justice Bradley, in the case last cited, that "congress, in most of the legislative acts by which it has made donations of the public lands to the states in which they lie for the purpose of aiding in the construction of railroads, has stipulated that the railroads so aided shall be public highways for the use of the government, free from all tolls or other charge for transportation of its property or troops." Conceding, therefore, in the case at bar, that congress, by the provisions, on this subject, of section 11 of plaintiff's charter, "stipulated," and did nothing more than stipulate, that the government, for its own uses, and upon the terms in said section prescribed, might possess and operate plaintiff's road, should the public interests at any time require such a course, surely it cannot be said that to thus provide for an extraordinary contingency implies a surrender by the government of its power of regulation in ordinary cases.

From the foregoing views it results that defendant's liability to plaintiff on account of the transportation service sued for is $13.20, while, by reason of defendant's tender of payment, plaintiff is liable for the costs of suit. Judgment will be accordingly entered.