## RUSSELL v. FARLEY.

1. Where an injunction is granted to a party without requiring him to give bond or other undertaking, the Circuit Court has no power to award damages to the injured party, except by such a decree in the matter of costs as may be deemed equitable.

2. In the absence of either an act of Congress, or a rule of court on the subject, the Circuit Court can, before granting an injunction, impose terms, and it can relieve therefrom whenever it would be oppressive or inequitable to continue them.

3. Where neither the bond given, nor the statutes, nor any rule of court, prescribes a specific mode of assessing damages, and the condition of the bond is simply to pay such as the adverse party may sustain by reason of the injunction, if the court finally decides that the party to whom it was granted is not entitled thereto, — Semble, that the court may, as an incident to its jurisdiction, cause them to be assessed under its own direction, or leave the party to his action at law.

4. The court decreed that this was not a case for damages. Held, that its action in the premises approaches so nearly to an exercise of discretion, that a very clear showing must be made to induce this court to reverse it.

APPEAL from the Circuit Court of the United States for the District of Minnesota.

The case is fully stated in the opinion of the court.

Mr. Richard L. Ashurst and Mr. Thomas H. Hubbard for the appellant.

Mr. Henry J. Horn for the appellee.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This case comes before us by appeal from a decree in a case in equity wherein Jesse P. Farley, as receiver of certain branch lines of the St. Paul and Pacific Railroad Company, and of all lands and other property appurtenant thereto, was complainant, and the firm of De Graff & Co., the Northern Pacific Railroad Company, the Lake Superior and Mississippi Railroad Company, B. S. Russell, G. W. Cass, receiver of the Northern Pacific Railroad Company, and C. W. Mead, general manager of said company, were defendants. The complainant was appointed receiver Aug. 1, 1873, in a foreclosure suit brought by John S. Kennedy and others, trustees under a mortgage given by the St. Paul and Pacific Railroad Company to secure fifteen millions of dollars of bonds issued by a subsidiary

corporation called the First Division of the St. Paul and Pacific Railroad Company, which had a contract to build the railroad, and a lease of the road for ninety-nine years. Amongst the assets supposed by the receiver to be subject to this mortgage was certain railroad iron, which had been purchased in England with the money raised by the sale of the bonds, to wit, 1,700 tons lying at Glyndon, on the line of the road, and 1,000 tons at Duluth, claimed by De Graff & Co., and 1,860 tons at Duluth, claimed by B. S. Russell, — that at Duluth being mostly held in the custom-house for unpaid duties, but some of it being about to be reshipped. The bill in this case was filed by the receiver in the State District Court for the county of Ramsey on the 21st of June, 1875, seeking to set aside the respective transfers of iron by virtue of which De Graff & Co. and Russell claimed to hold it, and for an injunction to restrain them from removing it, or taking it from the custom-house.

By a statute of Minnesota it is declared that, "when no special provision is made by law as to security upon injunction, the court or judge allowing the writ shall require a bond on behalf of the party applying for such writ, in a sum not less than two hundred and fifty dollars, executed by him or some person for him, as principal, together with one or more sufficient sureties, to be approved by said court or judge, to the effect that the party applying for the writ will pay the party enjoined or detained such damages as he sustains by reason of the writ, if the court finally decide that the party was not entitled thereto. The damages may be ascertained by a reference or otherwise as the court shall direct." 2 Bissell's Statutes, 806, sect. 121.

On filing the bill in this cause, the complainant (the said receiver) obtained a temporary injunction upon giving to the defendants a bond in the penalty of $10,000, with the following condition, to wit: "Whereas the said plaintiff is about to apply to this court for a temporary injunction enjoining and restraining the defendants, and each of them, from shipping, removing, selling, hypothecating, transporting, interfering, or intermeddling with 4,560 tons of iron rails now lying at Glyndon and Duluth, Minnesota, or any part thereof: Now, therefore, if the plaintiff will pay the parties enjoined by such

writ, or detained thereby, such damages as they or either or any of them may sustain by reason of the writ, if the court finally decide that the party was not entitled thereto, the above obligation shall be void, else of full force and virtue."

De Graff & Co. having by consent rebonded 1,000 tons of the iron claimed by them, the court, on the 11th of August, 1875, required a further bond from the complainant in the sum of $79,000, the condition of which was as follows, to wit: " Whereas an injunction has heretofore been granted in this court enjoining and restraining the said defendants, and each of them, from shipping, removing, selling, hypothecating, transferring, or interfering, or intermeddling with 4,500 tons of iron rails now lying at Glyndon and Duluth, Minnesota, or any part thereof; and whereas said injunction is still in force and effect except as to one thousand tons of said iron, claimed by said De Graff & Co., at Duluth, aforesaid; and whereas the said court has ordered, as a condition for the continuance of said injunction, that the plaintiff execute to the defendants herein a bond in the sum of seventy-nine thousand dollars, in addition to the bond for ten thousand dollars heretofore given by the plaintiff on the issuance of the injunction: Now, therefore, if the plaintiff will pay the parties enjoined by such injunction, or detained thereby, such damages as they, or either or any of them, may sustain by reason of such injunction, if the court finally decide that the party was not entitled thereto, the above obligation shall be void, else of full force and virtue."

The defendants severally answered the bill, and on the 1st of March, 1876, on application of the complainant, the cause was removed to the Circuit Court of the United States for the District of Minnesota. After taking a large amount of evidence, it was brought to a hearing, and on the 13th of October, 1877, a final decree was made dismissing the bill as to De Graff & Co., without costs to either party. As to the defendant Russell, who was charged with holding 1,860 tons of the iron, it appeared that he was acting as agent for William G. Morehead, who was trustee or agent for the First Division Company in procuring the iron and carrying on the work of construction, and who had sold to De Graff & Co., sub-contractors, the iron claimed by them, in part payment of moneys due them for

work; and had pledged a portion of the 1,860 tons of iron (claimed by Russell) to pay Jay Cooke & Co. for advances of money, and Jay Cooke & Co. had pledged and sold it to the United States (the Navy Department) for a debt due to it. Some 1,090 tons of the 1,860 tons in question remained at Duluth unsold, and this was claimed by Edward M. Lewis, trustee in bankruptcy of Morehead; but the court held that it was subject to the mortgage, and that the receiver was entitled to it. The decree on this part of the case was as follows, to wit: —

"It is also further ordered, adjudged, and decreed that the said Farley, as receiver, as against the defendant B. S. Russell, and against the defendant Edward M. Lewis, trustee in bankruptcy of William G. Morehead and others, is entitled, for the benefit of the trust which he represents, to all the iron rails in controversy herein not sold to De Graff & Co., and not pledged and sold to the Navy Department; which said iron rails, subject to the customs duties to the United States, thus decreed to the said Farley as receiver, he is authorized to use in the construction of the said extension lines, or to sell at the best prices and on the best terms practicable, and apply the net proceeds thereof to the credit of the mortgage, dated April 1, 1871, executed by the St. Paul and Pacific Railroad Company to Horace Thompson, George L. Becker, and William G. Morehead, trustees, who in the said trust have been succeeded by the said Wetmore, Pearsal, and Denny, as trustees, and which mortgage is now being foreclosed in this court, neither party as against the other to recover costs or damages. It is further adjudged and decreed that all transfers of the 1,860 tons of iron in controversy herein claimed by defendant Russell from William G. Morehead to said Russell, except transfers relating to the iron pledged to the Navy Department, are null and void, and that said Russell has no right, title, or interest therein as against the said Farley and said trustees. It is further ordered, adjudged, and decreed that said Farley has no right, title, or interest in the iron transferred to the Navy Department, and which is claimed herein by defendants Russell and Lewis; and it is further adjudged that neither the plaintiff nor the defendant Russell is entitled to costs or damages herein."

Russell alone appealed from this decree, and appealed only from that portion of it which declared that neither party as against the other is entitled to costs or damages.

That an appeal does not lie from a decree in equity as to the costs merely, is well settled. *Canter* v. *American & Ocean Insurance Co.*, 3 Pet. 307; *Elastic Fabrics Company* v. *Smith*, 100 U. S. 110. But it is contended by the appellant that the Circuit Court had no power to decree that he was not entitled to damages, thereby precluding him from recovering damages on the injunction bond; and, if it had any power to make a decree on the subject of damages, the decree denying him damages in this case is erroneous.

Had the cause remained in the State court, there can be no doubt that that court, under the Minnesota statute which required an injunction bond to be given, could have determined the question of damages. The statute expressly declares that "the damages may be ascertained by a reference, or otherwise, as the court shall direct." But the Circuit Court of the United States is not governed in its practice in equity by the laws of the State in which it sits, but by the rules of practice prescribed by this court and by the Circuit Court not inconsistent therewith; and, when these are silent, by the practice of the High Court of Chancery in England prevailing when the equity rules were adopted, so far as the same may reasonably be applied. Equity Rule 90. The injunction bond taken by the State court, it is true, comes into the Circuit Court with the other proceedings in full force; but the power of the Circuit Court to deal with it depends upon the principles which govern the practice of that court, the same as if it had been originally taken by its direction.

The question then arises whether the Circuit Courts have any power to make a decree on the subject of damages arising from an injunction, where an injunction bond has been required. Where no bond or undertaking has been required, it is clear that the court has no power to award damages sustained by either party in consequence of the litigation, except by making such a decree in reference to the costs of the suit as it may deem equitable and just. Has it any such power, or any power over the subject, where such a bond has been given?

For a solution of this question it will be proper to advert briefly to the history and object of this kind of obligations.

It is a settled rule of the Court of Chancery, in acting on applications for injunctions, to regard the comparative injury which would be sustained by the defendant, if an injunction were granted, and by the complainant, if it were refused. Kerr on Injunctions, 209, 210. And if the legal right is doubtful, either in point of law or of fact, the court is always reluctant to take a course which may result in material injury to either party; for the damage arising from the act of the court itself is *damnum absque injuria*, for which there is no redress except a decree for the costs of the suit, or, in a proper case, an action for malicious prosecution. To remedy this difficulty, the court, in the exercise of its discretion, frequently resorts to the expedient of imposing terms and conditions upon the party at whose instance it proposes to act. The power to impose such conditions is founded upon, and arises from, the discretion which the court has in such cases, to grant, or not to grant, the injunction applied for. It is a power inherent in the court, as a court of equity, and has been exercised from time immemorial. The older authorities refer to numerous instances in which it has been exercised. Chief Baron Gilbert in his Forum Romanum, p. 196 (repeated in Bacon's Abridgment, title Injunction, C), speaking of the course where an answer is put in, denying the equity of the bill, followed by a rule *nisi* to dissolve the injunction, says: " The plaintiff must show cause either upon the merits, or upon filing of exceptions; if upon the merits, the court may put what terms they please upon him, as bringing in the money, or paying it to the party, subject to the order of the court, or giving judgment with a release of errors, and consenting to bring no writ of error, or to *give security* to abide the order on hearing, or the like." See also Newland's Ch. Pract., 223, 224; Kerr, Injunctions, 212, 622; Story, Eq. Jur., sects. 958 *b*, 959 *d*. In *Marquis of Downshire* v. *Lady Sandys* (6 Ves. Jr. 107), A. D. 1801, Lord Eldon said if there was a real doubt on the subject in controversy, he would direct an issue, " taking care that if in the result of such a direction the defendant should be prejudiced by not being permitted to cut in the mean time [trees claimed to be orna-

mental], the plaintiff should undertake to pay the value if the decision should be against him." In a similar case, in 1825, the same judge made an order that the plaintiff should go before the master and give such security as would in the master's judgment secure to the defendants the value of all the trees which they should be prevented from cutting by the injunction, in case it should finally turn out in the judgment of the court that they ought not to have been enjoined in equity. *Wombwell* v. *Belasyse*, id. 110, note.

Mr. Kerr, in his treatise on Injunctions, says: "In balancing the comparative convenience or inconvenience from granting or withholding an injunction, the court will take into consideration what means it has of putting the party who may be ultimately successful in the position he would have stood if his legal rights had not been interfered with. The court may often by imposing terms on the one party, as the condition of either granting or withholding the injunction, secure the other party from damage in the event of his proving ultimately to have the legal right. . . . The defendant may be required to do such acts, or execute such works, or otherwise deal with the same as the court shall direct; or to enter into an undertaking to refrain from doing in the mean time the acts complained of by the bill, or to abide the order the court may make as to damages or otherwise, in the event of the legal right being determined in favor of the plaintiff. . . . So, on the other hand, as a condition of granting an injunction, [the court may] require the plaintiff to enter into an undertaking as to damages in the event of the right at law being determined in favor of the defendant, and the injunction proving to have been wrongly granted." Kerr, Injunctions, 212. Again, in another place, he says: "In doubtful cases where damage may be occasioned to the defendant in the event of an injunction or interim restraining order proving to have been wrongly granted, the court will require the plaintiff, as a condition of its interference in his favor, to enter into an undertaking to abide by any order it may make as to damages." Kerr, 622. In *Wilkins* v. *Aikin* (17 Ves. Jr. 422), where a bill was filed to prevent the infringement of a copyright; but it being doubtful whether the defendant did more than make allowable extracts from the plaintiff's

work, Lord Eldon said: " The proper course in this instance will be to permit this work to be sold in the mean time ; the defendant undertaking to account according to the result of the action." p. 426.

The same practice has prevailed in this country, in some cases in pursuance of statute, and in others, by the action of the court itself.   As early as 1723 a law was passed in Maryland, that any person desiring to proceed in equity against a verdict or judgment rendered against him in the County Court, should be required to give security in double the amount of the debt for the due prosecution of the injunction and payment of debt and all costs and damages that should accrue in the Chancery Court, or should be occasioned by the delay, unless the Court of Chancery should decree to the contrary, and in all things obey such order and decree as the court should make.   In 1793 an additional law was passed, to the effect that whenever application should be made for an injunction to stay proceedings at law, the Chancellor should have power and discretion to require the applicant to give a bond to the plaintiff at law, with condition to perform such order or decree as the Chancellor should finally pass in the cause.

Similar laws were passed in Virginia in 1787, and in New Jersey in 1799, and no doubt in other States at an early date. Their object was, where an adjudication had already been had at law, to make it compulsory on the Chancellor to require security before granting an injunction.   The jealousy of the courts of law at the interference of the Court of Chancery with their judgments is a matter of historical notoriety.   But these laws did not interfere with the Chancellor's discretionary power to require a bond in all other cases.

Regulations substantially similar to those above adverted to were prescribed by general rule of the Court of Chancery of New York prior to the adoption of the Revised Statutes.   In 1828 they were codified, with amendments, in that revision. But the rule, as well as the statute, only related to injunctions for staying proceedings at law.

In 1830, the Chancellor of New York, for the first time, made a general rule (No. 31), that where no special provision was made by law as to security, the *vice-chancellor,* or *master,*

who allowed an injunction out of court, should take from the complainant, or his agent, a bond to the party enjoined, either with or without sureties in the discretion of the officer, in such sum as might be deemed sufficient, not less than $500, conditioned to pay such party all damages he might sustain by reason of such injunction if the-court should decide that the complainant was not entitled to the same; and that the damages might be ascertained by a reference or otherwise, as the court should direct. 1 Hoffman, Ch. Pr. 80; 1 Barb. Ch. Pr. 622; 2 Paige (N. Y.), 122. The object, no doubt, was to prevent hasty and oppressive injunctions from being issued by subordinate officers.

This rule, enlarged and made applicable to all courts and judges, was copied in the New York Code of Procedure of 1848, sect. 195 (now sect. 222), and has been followed in other codes and systems of practice in other States. See 2 R. S. Wisconsin, 748; also Laws of Illinois, Iowa, Colorado, &c. It was substantially adopted in the Chancery Rules of New Jersey in 1853, except that it was left to the discretion of the officer to require a bond or not. It was copied in the statutes of Minnesota, under which the bonds in the present case were taken, as may be seen by comparing it with the section of said statutes already cited.

But no act of Congress or rule of this court has ever been passed or adopted on this subject. The courts of the United States, therefore, must still be governed in the matter by the general principles and usages of equity. To these we have already adverted so far as concerns the power to require security or impose terms before granting an injunction. It remains to notice the control which a Court of Chancery may exercise in relieving from or modifying such terms during the progress or at the termination of the cause, and of enforcing and carrying out the conditions imposed or the undertakings entered into.

Since the discretion of imposing terms upon a party, as a condition of granting or withholding an injunction, is an inherent power of the court, exercised for the purpose of effecting justice between the parties, it would seem to follow that, in the absence of an imperative statute to the contrary, the

court should have the power to mitigate the terms imposed, or to relieve from them altogether, whenever in the course of the proceedings it appears that it would be inequitable or oppressive to continue them. Besides, the power to impose a condition implies the power to relieve from it. If, for example, it is deemed proper, upon an application for an injunction, to require, as a condition of granting or withholding it, that a sum of money should be paid into court, or that a deed or other document should be deposited with the register, and the developments of the case are afterwards such as to make it manifestly unjust to retain the fund or document and deprive the owner of its use, the court assuredly has the power (though, undoubtedly, to be exercised with caution) to order it to be delivered out to the party. When the pledge is no longer required for the purposes of justice, the court must have the power to release it, and leave the parties to the ordinary remedies given by the law to litigants *inter sese.* Where the fund is security for a debt or a balance of account, or other money demand, this would rarely be allowable; but in many other cases it might not unfrequently occur that injustice would result from keeping property impounded in the court. On general principles the same reason applies where, instead of a pledge of money or property, a party is required to give bond to answer the damage which the adverse party may sustain by the action of the court. In the course of the cause, or at the final hearing, it may manifestly appear that such an extraordinary security ought not to be retained as a basis of further litigation between the parties; that the suit has been fairly and honestly pursued or defended by the party who was required to enter into the undertaking, and that it would be inequitable to subject him to any other liability than that which the law imposes in ordinary cases. In such a case it would be a perversion, rather than a furtherance, of justice to deny to the court the power to supersede the stipulation imposed.

Against this view, however, the appellants have strenuously urged the case of *Novello* v. *James* (5 De G., M. & G. 876), in which an injunction against the sale of certain compositions of Mendelssohn in violation of a copyright was obtained on an

undertaking of the plaintiff to abide the order of the court as to damages. After a three years' litigation the case was decided against the plaintiff. The legal title having been a doubtful one, the plaintiff moved that his bill might be dismissed without costs, and the defendant moved that the plaintiff might be decreed to pay him damages sustained by reason of the injunction. The Vice-Chancellor decided that the proper damages would be the costs of the suit. Upon appeal, this order was reversed upon the ground that the defendant, under the circumstances, had a right to insist on having his damages ascertained either by reference to an officer of the court, or by a trial at law. The Lords Justices thought that it would be unjust to the defendant to disregard, or not to give effect to, the undertaking which was the price at which the plaintiff accepted the injunction; and that there was not sufficient evidence before the Vice-Chancellor to enable him to decide what the defendant's damages amounted to, or whether the costs, supposing him not otherwise entitled to them, were a just measure of the damages.

It is evident, from a careful reading of this case, that the decision was based on the merits; and that the Lords Justices were of opinion that the defendant was entitled to damages; not as a matter of course because an undertaking had been given, but as a matter of justice and equity, which the undertaking would enable him to enforce. They held, therefore, that evidence of the damages should have been taken; and that the decree of the Vice-Chancellor was erroneous, because made without any such evidence. We do not perceive that this case is at all adverse to the view which we have taken.

When the court sees no just cause for superseding or suspending the effect of an injunction bond, or undertaking, it should be enforced in pursuance of its terms; and the party for whose benefit it was given will be entitled to an assessment of damages.

But then arises the question (not essential, however, to be decided in this case), how the damages should be assessed, and on this point different opinions have been entertained. Sometimes the form of the bond itself, or the order requiring it, or the statute or rule of court under which it is given, prescribes

the mode of assessment, as by a reference, or otherwise, as the court shall direct. This is the ordinary course in England, and is that prescribed in Chancellor Walworth's order, which, as before stated, is followed in several State statutes, and, amongst others, in the statute of Minnesota. In such case no question can arise as to the authority of the Court of Chancery to cause the damages to be assessed under its own direction.

But where, as in the present case, no specific provision is made either in the bond, or by any statute or rule of court, and the condition of the bond is simply to pay such damages as the parties enjoined may sustain by reason of the injunction if the court finally decide that the party was not entitled thereto, as before stated some difference of opinion exists as to the power of the Court of Chancery to assess the damages, and whether the only proper method is not an action at law on the bond. The appellants insist that the latter is the only proper and legal course. In the case of *Bein* v. *Heath* (12 How. 168, 179), Mr. Chief Justice Taney made this remark: "A court proceeding according to the rules of equity cannot give a judgment against the obligors in an injunction bond when it dissolves the injunction. It merely orders the dissolution, leaving the obligee to proceed at law against the sureties, if he sustains damage from the delay occasioned by the injunction." In that case, an injunction bond had been given to stay proceedings on an executory process in the Circuit Court for the District of Louisiana, and, in an action on the bond, that court had given judgment against the sureties, not merely for the damages arising from the delay caused by the injunction, but for the whole debt, interest and costs, in accordance with the law of Louisiana, where injunction bonds are binding to that extent, and where judgment is usually given against the sureties as parties to the cause, on dismissing the injunction, similar to the proceeding against stipulators in admiralty. This court held that the circuit courts sitting in equity could not take such a bond, or give it such effect, and reversed the judgment. The remark that the bond must be prosecuted at law was a mere passing remark; it was so prosecuted in that case; but from the great experience of the Chief Justice, it undoubtedly expressed the prevailing practice with regard to ordinary

injunction bonds given under the Maryland statute in cases of injunctions to stay proceedings at law. Whether the remark can be understood as having a wider scope is doubtful.

A decision on the point, however, was made by Mr. Justice Curtis, on the first circuit, in the case of *Merryfield* v. *Jones*, 2 Curtis C. C. 306. That was a patent case in which an injunction had been issued upon condition of entering into bond to pay the defendant any damages he might suffer by reason of the injunction if finally determined not to be rightful. On dismissal of the bill, motion was made to refer to a master the question of damages. Mr. Justice Curtis denied the motion, holding that the party's remedy was an action at law, but he only referred to the case of *Bein* v. *Heath*. The opinion is brief, and it does not appear that the question was very fully examined. The learned justice seemed to think that, inasmuch as the bond gave a legal action, the court sitting in equity had no jurisdiction over the question of damages.

Other cases are referred to by the counsel of the appellants to sustain their position; but upon a careful examination we are not satisfied that they furnish any good authority for disaffirming the power of the court having possession of the case, in the absence of any statute to the contrary, to have the damages assessed under its own direction. This is the ordinary course in the Court of Chancery in England, by whose practice the courts of the United States are governed, and seems to be in accordance with sound principle. The imposition of terms and conditions upon the parties before the court is an incident to its jurisdiction over the case; and having possession of the principal case, it is fitting that it should have power to dispose of the incidents arising therein, and thus do complete justice, and put an end to further litigation. We are inclined to think that the court has this power; and that it is an inherent power, which does not depend on any provision in the bond that the party shall abide by such order as the court may make as to damages (which is the usual formula in England); nor on the existence of an express law or rule of court (as adopted in some of the States) that the damages may be ascertained by reference or otherwise, as the court may direct; this being a mere appendage to the principal provision requiring a bond to

be taken, and not conferring the power to take one, or to deal with it after it has been taken. But whilst the court may have (we do not now undertake to decide that it has) the power to assess the damages, yet if it has that power, it is in its discretion to exercise it, or to leave the parties to an action at law. No doubt in many cases the latter course would be the more suitable and convenient one.

In the present case, however, the court did not attempt to assess any damages which the defendants may have sustained in consequence of the injunction and proceedings in the cause, but decreed that it was not a case for damages; in other words, that the bond ought not to be prosecuted. That damages were sustained is very probable. Such a litigation as this was could hardly fail to result in damage to all the parties engaged in it. But it is generally *damnum absque injuria.* The question before the court, or at least that which it undertook to determine, was whether, under the circumstances of the case, any damages at all ought to be recovered. Its decision was, that none ought to be recovered; or, in effect, that the bond ought not to be prosecuted. In view of what has already been said, we think that the court had power to decide this question.

But the appellants contend that, even if the court had the power to pass upon the question at all, its decision was erroneous, and ought to be reversed on the merits. On this point, the judgment of the court approaches so near to an exercise of discretion, that we should require a very clear case to be made in order to induce us to reverse it. The conduct of the parties and the course of litigation in the court below pass so directly under the inspection of that court, as to give it many advantages which no other court can possess, for forming a correct decision on the question, whether any extra damages should be allowed for the issuance of the injunction. Nevertheless, we have looked at the case with the view of ascertaining whether injustice has been done. And at the very threshold of the inquiry we are met by the prominent fact that the injunction has never been entirely dissolved, and it has never been decided that the complainant was not entitled to it, at least for a portion of the iron claimed by the appellant. The

latter strenuously defended the suit as to the whole; but it turns out, on the final hearing, that as to more than half of it his claim is unsupported, and that the injunction was properly issued. A decree was made accordingly, from which no appeal has been taken. We must presume that it was equitable and just. This fact alone would make a *prima facie* case for the decree in relation to damages. We have not been able to find anything in the record which leads us to think that it was erroneous or improper.

*Decree affirmed.*

Mr. Justice Gray did not sit in this case, nor take any part in deciding it.