**MINNESOTA POWER & LIGHT COMPANY, a Minnesota corporation, Plaintiff,**

v.

**D. Michael HOCKETT, Larry S. Wechter, and Jerry Williams, Defendants.**

No. IP971923CD/F.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 2, 1999.

Lee B. McTurnan, McTurnan & Turner, Indianapolis, IN, Richard L. Williams, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for Plaintiff.

Jeffrey B. Bailey, Locke Reynolds Boyd & Weisell, Indianapolis, IN, Henry J. Price, Price Potter & Mellowitz, Indianapolis, IN, for Defendants.

FOSTER, United States Magistrate Judge.

## ENTRY on

1. "Defendant's Motion to Recover Damages Including Attorneys' Fees", (doc. no. 154),

2. "Minnesota Power's Motion for Leave to file August 12, 1999 Preliminary Injunction Order of

Hamilton County Superior Court [*etc.*]", (doc. no. 167),

3. "Minnesota Power's Motion to Strike the Impertinent and Scandalous Matters from Hockett's Reply", (doc. no. 169),

4. Hockett's "Submission of Additional Authority [*etc.*]" (doc. no. 170), and

5. Hockett's "Submission of Relevant Portions of Hearing Transcript", (doc. no. 176).

On April 23, 1999, the United States Court of Appeals for the Seventh Circuit remanded this Cause to this Court with instruction to enter the district judge's order dismissing this suit for lack of subject matter jurisdiction. *Minnesota Power & Light Co. v. Hockett*, No. 98–1099, Judgment—With Oral Argument and Order, 1999 WL 269755 (7th Cir., April 23, 1999) (unpublished). The Cause has been dismissed. Mr. Hockett now moves to recover damages and costs, including attorney's fees, from plaintiff Minnesota Power and Light (now just "Minnesota Power") for being wrongfully enjoined. As noted in the heading, there are also some related supplemental motions.

### 1. "Defendant's Motion to Recover Damages Including Attorneys' Fees", (doc. no. 154).

Taking his arguments as a whole, Mr. Hockett argues two legal bases for his motion. First, and most important, he wants the "automatic" award of damages and costs which is granted whenever a temporary restraining order or preliminary injunction is overturned. He relies almost entirely on Indiana common law for this right but he mentions Fed.R.Civ.P. 65(c) as well and we consider his request under that authority too. Secondly, he argues that Minnesota Power's bad faith litigation of this case justifies an award to him of his attorney's fees as a sanction.

### Indiana Common Law.

■ Mr. Hockett argues that his entitlement to damages, costs, and attorney's fees caused by the wrongful injunction should be determined according to Indiana law because the parties agreed that Indiana law would govern the substantive aspects of their Agreement. According to Mr. Hockett—and we have no reason to question his citations—Indiana law permits a party to recover all damages and costs, including attorney's fees, caused by a wrongful injunction by either motion in a pending case or separate action. But this is an odd argument for Mr. Hockett to make; he fought and won his battle in this Court and the Court of Appeals for dismissal on the ground that that his agreement was not with Minnesota Power, but with Adesa and Adesa Holdings, who are not parties to this suit. True, this Court indicated, and the Court of Appeals found, that substantive issues in a suit seeking to enforce the August 20, 1996 Agreements would be governed by Indiana law as explicitly provided in that Agreement. But both Courts found that Minnesota Power was not a real party in interest and could not enforce the agreement itself because it was neither a signatory to nor a third-party beneficiary of that Agreement. Because there is no agreement between Minnesota Power and Mr. Hockett, they have not agreed to the application of Indiana law. In any event, federal law supersedes parties' agreements on this issue: the right to recover in federal court for wrongful injunction by a federal court is governed by federal, not state, law. *Russell v. Farley*, 105 U.S. 433, 437, 26 L.Ed. 1060 (1881) (a federal court sitting in equity under diversity jurisdiction is not governed by the laws of the state in which it sits, but only by the federal rules; recovery of damages for improper injunction is a matter of practice governed by federal law); *Fireman's Fund Ins. Co. v. S.E.K. Construction Co.,* 436 F.2d 1345, 1351 (10th Cir.1971); 13 *Moore's Federal Practice, 3rd Ed.* § 65.33 (1999 (Release 122, June 1999)). Federal, not Indiana, law governs Mr. Hockett's request for damages, costs, and attorney's fees.

### Rule 65(c).

Mr. Hockett mentions Rule 65(c) as a basis for his motion only in passing, but it

942

is the ground probably most firm for him. Rule 65(c) reads, in relevant part:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Mr. Hockett argues that attorney's fees are included in "costs and damages" under Rule 65(c) and that, while the liability of Minnesota Power's surety is limited by the bond, Minnesota Power itself is liable for all damages and costs caused by the wrongful injunction regardless of the bond limit. As a condition to the issuance of the temporary restraining order and preliminary injunction, the district judge required Minnesota Power to file security in the amount of $50,000. It filed a bond in that amount with St. Paul Fire & Marine Insurance Companies as surety.

■ A wrongfully enjoined party's right to recover damages and costs is considerably narrower under federal law than under Indiana law.[1] A wrongfully enjoined party may recover his damages and costs only if a security was filed pursuant to Rule 65(c); there is no independent common law entitlement to compensation. *W.R. Grace and Co. v. Local Union 759, Internat'l Union of the United Rubber, Cork, Linoleum and Plastic Workers of America,* 461 U.S. 757, 770 n. 14, 103 S.Ct. 2177, 2185 n. 14, 76 L.Ed.2d 298 (1983) ("A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond"); *Russell,* 105 U.S. at 437 ("Where

no bond or undertaking has been required, it is clear that the court has no power to award damages sustained by either party in consequence of the litigation ...."); *Cagan v. Mutual Benefit Life Insurance Co.,* 28 F.3d 654, 656 (7th Cir.1994) ("in all but exceptional cases the lack of an injunction bond means the unavailability of damages for wrongful injunction"). If security was required and filed, both the principal's and the surety's liability for damages and costs is limited to the amount of the security. *Diginet, Inc. v. Western Union ATS, Inc.,* 958 F.2d 1388, 1394 (7th Cir.1992) ("the amount of the bond places a ceiling on the damages that a defendant can obtain for the wrongful grant of an injunction, unless the plaintiff was acting in bad faith"); *American Hospital Supply Corp. v. Hospital Products Limited,* 780 F.2d 589, 597 (7th Cir.1986); 13 *Moore's Federal Practice* § 65.50[2]; Note, "Recovery for Wrongful Interlocutory Injunctions Under Rule 65(c)", 99 *Harv. L.Rev.* 828, 829–30 (1986) ("Almost universally, courts have held that the amount of the bond is the limit of the plaintiff's liability and that, if a bond is not posted, the plaintiff cannot be held liable"). Finally, wrongfully enjoined parties may not recover attorney's fees as part of their damages and costs. *Coyne–Delany Co., Inc. v. Capital Development Board of the State of Illinois,* 717 F.2d 385, 390, 393–94 (7th Cir.1983); 13 *Moore's Federal Practice* § 65.50[3].

■ In issuing the temporary restraining and preliminary injunction orders, the district judge set bond in the amount of $50,000.[2] Although the bond filed by Minnesota Power was technically broader

---

1. Under both Indiana and federal law, a defendant may recover damages and costs for wrongful injunction even when the injunction is vacated for lack of subject matter jurisdiction and not on the merits of the underlying claims and defenses. *National Sanitary Supply Co. v. Wright,* 644 N.E.2d 903, 905 n. 1 (Ind.Ct.App.1994), *transfer denied; Showtime Marketing, Inc. v. Doe,* 95 F.R.D. 355 (N.D.Ill., 1982). *See State of Alabama v. United States Environmental Protection Agency,* 925 F.2d 385 (11th Cir.1991).

2. Temporary Restraining Order (doc. no. 14), p. 2 ("The applicant has offered to provide security by bond or an undertaking if necessary; the Court sets bond in the amount of $50,000 $^{00}$"); Preliminary Injunction Order (doc. no. 20), p. 3 (same); Findings of Fact and Conclusions of Law (doc. no. 29), Conclusions of Law, ¶ 16 ("Minnesota Power shall post a bond in the amount of Fifty Thousand Dollars ($50,000.00)").

in language than required by Rule 65(c) or the district judge's orders[3], the case law limiting plaintiffs' liability to the amount of security determined by the judge supersedes the terminology of the particular bond or any superfluous undertakings.

Therefore, Minnesota Power's liability for Mr. Hockett's damages and costs is limited to $50,000 and Mr. Hockett may not recover his attorney's fees. To recover Rule 65(c) costs and damages, Mr. Hockett must demonstrate that he suffered damages caused by the preliminary injunction.[4] To recover economic "opportunity costs", he must show that the preliminary injunction prohibited him from engaging in profitable activities which his covenants with Adesa and Adesa Holdings permitted and in which he desired and had the wherewithal to engage.[5] According to his agreement with Adesa and Adesa Holdings, Mr. Hockett agreed that he would not, directly or indirectly, within the continental United States and Canada, "engage in or be interested in (a) the vehicle redistribution business . . ., (b) the vehicle auction business or (c) the dealer floorplan business" or assist or encourage any other person from so engaging. August 20, 1996 Agreement ("Agreement"), §§ 7.1 and 7.2, Supplemental Verified Complaint (doc. no. 65), Exhibit F. He also agreed not to, "directly or indirectly, on behalf of himself or another, solicit the hiring of, or hire without written consent, any person employed by ADESA or any of its subsidiaries". Agreement, § 7.4; First Amendment to August 20, 1996 Agreement, ¶ 1(b). The Preliminary Injunction Order ordered Mr. Hockett to (a) "immediately cease development or operation of any vehicle auction and/or redistribution business . . . including the auto transport business in the continental United States and Canada", (b) "immediately cease solicitation or hiring of any employees of Great Rigs Incorporated an indirect subsidiary of Minnesota Power located in Moody, Alabama", and (c) "immediately cease negotiations, consummation of, operation of, or purchase of any interest in Alphamega, Inc., incorporated in the state of Alabama and located in Albertville, Alabama or other auto transport business." Preliminary Injunction Order (doc. no. 20), p. 2.[6]

Because Great Rigs is a subsidiary of Adesa and Mr. Hockett agreed not to solicit or hire any employee of an Adesa subsidiary, the Preliminary Injunction's order to Mr. Hockett to "cease solicitation or hiring of any employees of Great Rigs", Preliminary Injunction ¶ (b), could not have caused Mr. Hockett any damages. He apparently looks to the injunction's

---

3. The bonds filed by Minnesota Power are in the following words:

> We, the undersigned, Minnesota Power & Light Company, as principal, and St. Paul Fire & Marine Insurance Companies, as Surety, hereby undertake that the plaintiff will pay to the defendant such damages and costs as may be incurred or suffered by any party who is subsequently found by the Court to be wrongfully enjoined or restrained by the ["Temporary Restraining Order" or "Preliminary Injunction Order"] issued on ["December 5, 1997" or "December 12, 1997", respectively], *provided that the liability of the Surety shall be limited to a maximum bond penalty of $50,000.*

Temporary Restraining Order Bond (doc. no. 17/18); Preliminary Injunction Order Bond (doc. no. 26) (emphasis added). The last phrase literally leaves Minnesota Power liable to "pay to the defendant such damages and costs as may be incurred or suffered" by Mr. Hockett and is thus in the nature of a volun-

tary undertaking by Minnesota Power. The district judge, however, required a bond of $50,000 and, as noted in the text, his order controls the limit of Minnesota Power's liability.

4. As a prevailing party, Rule 54(d)(1) allows Mr. Hockett the ordinary costs of suit listed in 28 U.S.C. § 1920.

5. Of course, Mr. Hockett may also claim affirmative losses caused by the preliminary injunction (except for attorney's fees), but his briefs suggest that only opportunity costs are in view.

6. The Temporary Restraining Order, issued seven days earlier, was the same as the Preliminary Injunction *except* that it failed to reflect the March 10, 1997 Agreement that specifically permitted Mr. Hockett to continue his involvement in the Bradenton Auction in Bradenton, Florida.

other two orders as bases for damages. To the extent that the Preliminary Injunction orders Mr. Hockett to "immediately cease development or operation of any vehicle auction and/or redistribution business", ¶ (a), it again merely restates Mr. Hockett's agreement with Adesa and Adesa Holdings to not "engage in or be interested in ... the vehicle redistribution business" and "the vehicle auction business". Mr. Hockett's only potential sources of damages is in the Preliminary Injunction's addition of the phrase "including the auto transport business", ¶ (a), and the specific prohibition on involvement with Alphamega, Inc., ¶ (c). In its complaint and at the preliminary injunction hearing, Minnesota Power asserted that Mr. Hockett was involved in the formation of F & J Transport/Alphamega, an auto transport company, and that his involvement violated the terms of the Agreement's covenant not to compete. While there was much dispute at the hearing about whether Mr. Hockett's covenant not to compete in the "vehicle redistribution" business prohibited his involvement in the "auto transport" business, which the Preliminary Injunction prohibited, Mr. Hockett consistently denied Minnesota Power's only allegation of his involvement in the auto transport business. He asserted that his brief involvement with Alphamega was insubstantial [7], he voluntarily withdrew from the company shortly after its inception [8], and had no further involvement with it afterwards. He also offerred to consent to the terms of the Preliminary Injunction. Indeed, in his briefs on the present motion, Mr. Hockett specifies only the costs and expenses of this litigation as a basis for damages; he does not assert or suggest any lost opportunity in the auto transport business which he was ready and willing to undertake.

Mr. Hockett has not shown any basis for a hearing on or award of Rule 65(c) damages. If he wishes to pursue a motion under Rule 65(c), he shall file a bill of particulars listing, in separate numbered paragraphs, each specific item of damage suffered and include a detailed explanation of how the listed item of damage was proximately caused by the Preliminary Injunction and not by the terms of the Agreement. Mr. Hockett shall file the bill of particulars or a notice of no intention to proceed against Minnesota Powers' bond no later than Monday, January 3, 2000. If Mr. Hockett decides not to proceed against the bond, he shall include with his notice of no intention to proceed a draft order exonerating the preliminary injunction and temporary restraining order bonds. We note that, if the determination of any item of Mr. Hockett's costs or damages depends upon the adjudication of any issue, matter, or question involved in the state court suit, this Court will likely hold this motion in abeyance until the state court suit is resolved.[9]

### Bad faith.

Most of Mr. Hockett's motion and briefs are devoted to allegations of Minnesota Power's bad faith in initiating and litigating this suit. Under Rule 11 and inherent authority, courts may sanction parties for litigating in bad faith and, as an exception to the American Rule, may in-

---

7. Mr. Hockett's counsel asserted that Mr. Hockett was mistakenly listed as a director in Alphamega's incorporation papers, he withdrew before its incorporation, he had no financial interest in the company, and was not involved in the operation or management of the company.

8. Mr. Hockett contended that he decided to withdraw before incorporation papers were filed after being reminded by a Minnesota Power or Adesa lawyer of his covenant not to compete and because he interpreted his covenant not to solicit or hire as prohibiting his involvement because Great Rigs' former general manager, Mr. Upton, was involved with the company (although Mr. Hockett denied any involvement in soliciting or hiring the former officer).

9. Any findings or conclusions that were made by this Court regarding the merits of the claims or defenses of the parties were made for the purposes of the temporary restraining order or preliminary injunction only and were not final decisions encompassed in a judgment.

clude in the sanction liability for an opponent's attorney's fees and other litigation costs and expenses. *Coyne–Delany,* 717 F.2d at 390 ("In the absence of statute, an award of attorney's fees is proper only where the losing party has been guilty of bad faith, as by bringing a frivolous suit— frivolousness connoting not just a lack of merit but so great a lack as to suggest that the suit must have been brought to harass rather than to win"). Mr. Hockett alleged several instances of Minnesota Power's bad faith:

1. In its complaint and during the preliminary injunction hearing, Minnesota Power falsely asserted that (a) the Agreement at issue was between the parties when the Agreement was actually between Mr. Hockett and Adesa and Adesa Holdings; (b) Great Rigs was a subsidiary of Minnesota Power when it is actually a subsidiary of Adesa; (c) Great Rigs was an Alabama corporation when it is actually an Indiana corporation; and (d) notice of the complaint and T.R.O. motion was given to Mr. Hockett's counsel when actually no notice was given.

2. Minnesota Power failed to give notice to Mr. Hockett's counsel before seeking the temporary restraining order when they knew who that counsel was.

3. Minnesota Power engaged in a strategy of protracted litigation by moving for expedited discovery, pressing for early deadlines, creating needless discovery disputes, bombarding Mr. Hockett with filings, and continuing to litigate and appeal this case after the lack of jurisdiction was evident.

4. Mr. Hallett testified falsely on behalf of Minnesota Power at the preliminary injunction hearing.

Mr. Hockett argues that Minnesota Power's deceptions and lack of candor regarding signatories, corporate relationships, and citizenships was intended to disguise the lack of diversity jurisdiction and that it initiated this bad faith litigation for the purpose of extracting personal, financial, and business information from Mr. Hockett in order to disrupt or interfere with his right to compete and solicit after his covenants expired.

■ Regardless of the misstatements in Minnesota Power's pleadings, it does not appear that Mr. Hockett or the Court were unaware that Minnesota Power was not a signatory to the Agreement containing Mr. Hockett's covenants not to compete or solicit. In addition, the alleged misrepresentation of Great Rigs' citizenship and corporate relationship did not affect Minnesota Power's argument that there was diversity because it was a third-party beneficiary of the Agreement. Mr. Hockett has not shown or described how the failure to give notice to Mr. Hockett's counsel prevented or hindered his counsel's meaningful participation in the preliminary injunction hearing. His counsel took a very active part in the hearing and other proceedings. Therefore, although we certainly deplore any misrepresentations and false allegations by Minnesota Power, they did not materially affect Mr. Hockett's litigation costs and do not warrant a hearing on awarding attorney's fees as a sanction.

■ On considering Mr. Hockett's allegations of litigation abuses by Minnesota Power and on reviewing the record in this case, we conclude that Minnesota Power can be charged only with aggressive, but not abusive, unfounded, or frivolous, litigation. Minnesota Power's pressing for early deadlines, disputing discovery requests, continuing to litigate and appeal the issue of jurisdiction does not constitute bad faith and does not warrant an award of attorney's fees. Although both this Court and the Court of Appeals found no basis for Minnesota Power's involvement in this case other than to create diversity jurisdiction, we recognize that simply attempting to obtain a federal forum is not evidence of bad faith. Attempting to do so on frivolous or improperly-motivated grounds is bad faith. But although Minnesota Power's argument that it was a third-party beneficiary of the Agreement and/or a real party in interest was wrong, we cannot

conclude that its argument was frivolous. Neither the Court nor Mr. Hockett raised the issue until later in the case and its eventual presentation was not caused by the discovery of any additional relevant facts. Once the question was examined after briefing, and it was determined that Minnesota Power was not a proper party, it was clear that the only basis for Minnesota Power's presence was for the purpose of obtaining federal jurisdiction. The Court's strong language regarding Minnesota Power's "manipulation" was in part a comment on the weakness of its position and an admonishment that it should better investigate and prepare its grounds for jurisdiction in future cases. The standard for a Rule 11 or bad faith sanction, however, is frivolousness, which is a lower threshold than this Court likes to expect as a matter of course from its advocates.

The charge that Mr. Hallett testified falsely at the preliminary injunction hearing is a more serious matter. However, the allegations appear for the first time in Mr. Hockett's Reply and he filed a transcript of Mr. Hallett's testimony in the state court action in support of the allegations long after briefing closed.[10] Mr. Hockett has not explained (and it is not evident) why he could not have presented these allegations in his original filings. Minnesota Power correctly points out that arguments or evidence first presented in reply either should not be considered or the opposing party should be allowed an opportunity to respond. Because the allegations and evidence regarding Mr. Hallett's inconsistent testimony were available for presentation before Minnesota Power's Response, and in consideration of the already protracted nature of the litigation of this suit and this motion, we exercise our discretion to confine our consideration of the merits of Mr. Hockett's motion to the matters originally presented. Therefore, we disregard the allegations concerning Mr. Hallett's testimony in Mr. Hockett's Reply.

█ Alternatively, we conclude that Mr. Hockett's allegations do not support holding a hearing on Minnesota Power's bad faith litigation of this suit. Mr. Hockett contends that Mr. Hallett testified falsely in three particulars. First, he testified before this Court that he directed that exit interviews be taken of the departing Great Rigs employees; that those exit interviews were carried out by Mr. South, the acting general manager of Great Rigs; that Mr. South reported to him that employees said that Mr. Hockett was backing F & J Transport financially. In the state court hearing, Mr. Hallett testified that he was mistaken if he characterized Mr. South's discussions with Great Rigs' employees as formal exit interviews; that Mr. South informally talked with departing and current Great Rigs employees; and that Mr. South reported to Mr. Hallett that the employees said they assumed or suspected that Mr. Hockett was providing financial assistance to F & J Transport. Mr. Hockett also submitted portions of Mr. South's deposition wherein he testified that he reported only that he did not hear that anyone was involved in F & J Transport except the departing Mr. Upton. It is undisputed that, at the preliminary injunction hearing, Minnesota Power's counsel and Mr. Hallett specifically characterized the discussions undertaken by Mr. South with Great Rigs employees as formal exit interviews and that they, in fact, emphasized the formality and regularity of the interviews as a species of "business records" in order to avoid a perceived hearsay problem. While we are troubled by Mr. Hallett's later diminishment of the formality of the "interviews" (closer to "chats", apparently), and find his excuse for the inconsistency incredible, we do not find that the misrepresentations had a material effect on this litigation. Whether the information that Mr. Hockett was somehow financially involved in Alphamega came from formal exit interviews or informal chats does not significantly alter

---

**10.** "Submission of Relevant Portions of Hearing Transcript" (doc. no. 176). The Court construes this filing as a motion for leave to file a supplemental submission.

its effect. In either case, the information was reported as gathered from former and current employees and, if "rumors" is the proper description of the nature of the information, whether the rumors were related in formal interviews or informal chats is irrelevant. In his testimony, Mr. Hallett did not opine on the evident or apparent reliability of the information or whether steps were taken to verify it. It would have been better if Mr. Hallett had correctly testified that the information came from informal discussions with employees rather than exit interviews, but that would not have altered the content of the information he testified that he heard nor would it have materially added to or detracted from its quality. Mr. Hockett's argument that Mr. South later testified that he reported only that Mr. Upton was involved in the formation of Alphamega is not quite supported by the record. Under questioning by Mr. Hockett's counsel, Mr. South testified as follows:

> Q. And did you report to Mr. Hallett that you had no information that anybody else was involved in the formation of Alphamega other than Mr. Upton?
> A. Yes, I did.

South Deposition, p. 216 (Reply, Exhibit 8). Yet, later in his deposition, Mr. South testified:

> A. You know, the only thing I know is I heard rumors that after Keith [Upton, Great Rigs' general manager] left, that Mr. Hockett had to be involved in this business somehow and I passed that information along to Mr. Hallett and he asked me what I was hearing, I told him, I said, "I don't know Mr. Hockett." I said, "But I hear rumors that he's probably behind it somehow."

*Id.,* p. 273–74. Mr. South confirms the essence of Mr. Hallett's testimony that he was told that Great Rigs employees suspected that Mr. Hockett was involved in the formation of Alphamega. Mr. Hockett does not dispute that it was rumored among the employees of Great Rigs that Mr. Hockett was involved in Alphamega; that several employees left Great Rigs and joined Alphamega, including its general manager; that Mr. Hockett was initially listed as a director of Alphamega in its incorporation papers; or that Mr. Hallett knew these facts. These facts support a reasonable belief on Mr. Hallett's and Minnesota Power's part that Mr. Hockett had violated his covenant not to compete.[11] Mr. Hockett's allegations of false testimony by Mr. Hallett affects only the periphery of the facts testified to by Mr. Hallett.

■ The second alleged falsehood by Mr. Hallett concerns when he spoke with Mr. Hockett about his involvement in Alphamega and whether Mr. Hockett told Mr. Hallett before this suit was filed that he had withdrawn from the company. Mr. Hallett testified at the preliminary injunction hearing that he spoke with Mr. Hockett only after this suit was filed and that Mr. Hockett never told him of his participation in or withdrawal from Alphamega. Mr. Hockett contends that, in the state court hearing, Mr. Hallett testified that Mr. Hockett told him before this suit was filed that he had withdrawn from participation in Alphamega. We are troubled by the inconsistency in Mr. Hallett's testimony, but, again, we find that it had no material effect on the hearing. If Mr. Hockett had told Mr. Hallett before this suit was filed that he had withdrawn from Alphamega, it was still reasonable for Mr. Hallett and Minnesota Power[12], to believe that he had violated his covenant not to compete at least with respect to Alphamega and at least up to the time of his withdrawal. It was not frivolous for a suit to be filed to enforce the Agreement's covenants and it was reasonable on these

---

11. Again, Mr. Hockett himself interpreted his covenants to prohibit his involvement with Alphamega and he claimed that he voluntarily withdrew from the company for that reason after being reminded of the covenants by Minnesota Power's counsel.

12. Again, without regard to the lack of diversity jurisdiction because Mr. Hockett's covenants were with Adesa and Adesa Holdings and not with Minnesota Power.

facts (without regard to jurisdiction) to enjoin any further violation of the covenants by Mr. Hockett. In short, considering the information that Mr. Hallett and Minnesota Power knew, the fact that Mr. Hockett told Mr. Hallett that he had withdrawn from Alphamega did not render a subsequent suit to enforce the Agreement unreasonable or frivolous. Mr. Hallett was not required to believe Mr. Hockett, that Mr. Hockett was unlikely to be involved in any other breaches of his covenants, or that an enforcement action was not warranted.

█ The third alleged falsehood by Mr. Hallett regards his testimony that, because of Mr. Hockett's breach of his covenants, Great Rigs had lost its eighth largest customer, a company called Fleet Max owned and operated by sons of Mr. Hockett. But Mr. Hockett's argument amounts to quibbles about whether Fleet Max was Great Rigs' eighth largest customer or not and whether any lost business went to Alphamega or other competitors. In the state court hearing, Mr. Hallett testified that he did not know the precise sales numbers and that, while he believed that Fleet Max was the eighth largest, he couldn't be certain without reviewing the numbers. He did testify, however, that, if not exactly the eighth largest customer, Fleet Max was a substantial customer. Mr. Hockett presented invoices showing that Fleet Max provided services to Great Rigs after Mr. Hockett left the company. But Mr. Hallett testified that he recalled Fleet Max having a $100,000 receivables balance, Transcript, Preliminary Injunction Hearing, p. 43–44, and the invoices Mr. Hockett presented are for amounts in the hundreds of dollars. While the invoices show that Great Rigs did not lose all of Fleet Max' business, the invoices do not show how much of the business remained after Mr. Hockett left and Alphamega started. Mr. Hallett's testimony that Great Rigs "lost" its eighth largest customer, Fleet Max, is reasonably interpreted as meaning that Great Rigs lost Fleet Max as a substantial customer, not necessarily that they

lost all of its business. Because Mr. Hockett did not show or allege what percentage of Fleet Max' business remained with Great Rigs as evidenced by the invoices, Mr. Hallett's testimony is not impugned. It would have been better had Mr. Hallett testified precisely and technically (it would be better if all witnesses so testified), but the amount of lost business suffered on account of Mr. Hockett's alleged breaches was not the issue at the preliminary injunction hearing; the issue was the breaches themselves. Parties in whose favors covenants not to compete or solicit are made do not have to wait until covenant-breakers make a success of it to enforce their covenants; they may nip them in the bud.

Because none of Mr. Hallett's alleged falsehoods caused Mr. Hockett to incur additional litigation costs, an award of attorney's fees as a sanction for any bad faith litigation on Minnesota Power's part is not warranted.

Mr. Hockett has not shown that an award of attorney's fees is warranted for any bad faith litigation by Minnesota Power.

2. **"Minnesota Power's Motion for Leave to file August 12, 1999 Preliminary Injunction Order of Hamilton County Superior Court [*etc.*]", (doc. no. 167).**

This motion is denied as the decision of the Hamilton County Superior Court to issue a preliminary injunction in the case pending before it and based on the argument and evidence before it is irrelevant to the motion at hand in this Court.

3. **"Minnesota Power's Motion to Strike the Impertinent and Scandalous Matters from Hockett's Reply", (doc. no. 169).**

This motion is denied. The subject of this motion is addressed herein.

4. **Hockett's "Submission of Additional Authority [*etc.*]" (doc. no. 170).**

Construed as a motion to file supplemental material, the motion is granted.

5. Hockett's "Submission of Relevant Portions of Hearing Transcript", (doc. no. 176).

Construed as a motion to file supplemental material, the motion is granted. The subject of this motion is addressed herein.